The Southern Fire Brick and Clay Company

*v.*

The Garden City Sand Company *et al.*

and

Dick N. Lanyon *v.* Same.

*Opinion filed October 23, 1906—Rehearing denied Dec. 11, 1906.*

1. Contracts—*contracts in partial restraint of trade may be valid.* Contracts in partial restraint of trade, in order to be valid, must be reasonable as to time, place, terms, etc., and manifest an intention to simply protect the party relying upon the covenant by a reasonable restraint upon unjust discrimination against him.

2. Same—*purpose of the anti-trust statutes.* The purpose of the Federal and State anti-trust statutes is to prohibit the formation of trusts and combinations and to remove all obstructions in restraint of trade and free competition, but not to prevent contracts upon the part of private corporations and individuals intended merely to foster trade and business, although they may partially restrain competition or trade.

3. Same—*when a contract in partial restraint of trade is valid.* A contract, to run for a period of eight years, whereby the owner of a bed of fire clay agrees to erect a plant, experienced fire clay miners agree to run it and several corporations agree to take a specified amount of the product daily at a fixed price, the first party agreeing not to operate a fire clay plant on any other land owned or controlled by him in the State, the second parties agreeing not to sell fire clay to any other parties than the corporations specified, and the latter agreeing not to buy any fire clay in the State except that produced by the second parties and not to enter into any combination or trust to limit the output of the plant, is not invalid as being in restraint of trade.

4. Injunction—*breach of a negative covenant may be enjoined.* An agreement by a party to a contract not to operate any other fire clay grinding plant upon any land owned or controlled by him and not to sell fire clay to any other persons during the life of the contract is a direct negative covenant, and a court of equity has jurisdiction to enjoin its breach, even though it might have no power to compel him to specifically perform his contract.

5. Same—*right to enjoin breach of negative covenant not dependent upon remedy at law.* The right to an injunction to enforce a negative covenant is independent of the question whether an ac-

tion at law will lie or not, and does not depend upon the subject matter of the contract but may relate to any interest in or charge upon property.

6. SAME—*when party cannot complain that injunction will injure his business.*  A party who purchases land and erects a fire clay plant thereon with full knowledge that his vendor is violating a contract with other parties in making the sale and permitting the plant to be erected, cannot complain, as an innocent party, that his business is injured by an injunction restraining the sale of fire clay from the land in question to any persons other than the parties entitled thereto under the contract.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. M. KAVANAGH, Judge, presiding.

The Garden City Sand Company, the Hillsdale Fire Brick and Clay Company, (both Illinois corporations,) and Maria Warner and Jacob B. Warner, of Indianapolis, Indiana, filed their joint bill in the superior court of Cook county April 4, 1903, against the Southern Fire Brick and Clay Company, also an Illinois corporation, and Dick N. Lanyon, by which they sought to enjoin the defendants from mining fire clay upon a certain tract of land in Vermilion county, Indiana, and from selling the same to any parties other than the complainants, at any time prior to September 10, 1909, and from making the clay into fire brick or other clay products, and for an accounting for fire clay already manufactured and sold. An amended and supplemental bill was filed September 24, 1904, alleging that on September 10, 1901, a contract was entered into in writing between Dick N. Lanyon, first party, James A. Heber and Willis S. Bonebrake, second party, the Garden City Sand Company, third party, the Hillsdale Fire Brick and Clay Company, fourth party, and J. B. Warner and Maria Warner, fifth party, which provided as follows:

The second party, James A. Heber and Willis S. Bonebrake, agreed to mine, grind and operate for the first party, Dick N. Lanyon, his fire clay grinding plant located at Jonesdale switch, Vermilion county, Indiana. Said first and second parties agreed that they would deliver f. o. b. cars at said switch first-class marketable fire clay at seventy-seven and one-half cents per ton, in such quantities and at such times as the third, fourth and fifth parties might order. The first party agreed to erect and equip a new plant at his own expense for the grinding of the clay, and the second parties were to give their individual personal attention to the operation of said plant. The first party also agreed not to operate any other fire clay grinding plant on any land that he owned or controlled in the State of Indiana, and the first and second parties agreed not to sell fire clay to any other persons than the third, fourth and fifth parties during the time of the contract. The second, third, fourth and fifth parties agreed to cease to operate a certain plant located at Russell switch, Indiana, but in case the new plant could not supply the demand, the old plant at Russell switch was to be re-opened. The third, fourth and fifth parties agreed that they would not buy fire clay produced in the State of Indiana, except such as was produced by the parties to the contract, and they would make the greatest possible effort to sell all the fire clay so produced, and would jointly order and pay for not less than an average of forty tons for every working day during the period of the contract, for which they were to pay seventy-seven and one-half cents per ton, and not enter into any combination or trust for the purpose of limiting the output of either plant. The contract was to be in full force and effect for a period of eight years, and after its execution on October 26, 1901, was filed for record in the recorder's office of Vermilion county, Indiana.

The bill further alleged that Lanyon began the erection of the plant on his land at Jonesdale switch, but that it was never completed; that on September 17, 1902, the defend-

ant the Southern Fire Brick and Clay Company received from Lanyon and wife a warranty deed conveying about ninety-three acres of the lands contained in the contract, with full notice of the contract and its terms, and commenced the erection of a plant upon the same, and was subsequently notified by complainants that, if necessary, legal steps would be taken to restrain it from operating a plant or selling fire clay in violation of the terms of the contract; that on May 28, 1902, the complainants served notice on the first and second parties that more than enough time to equip the plant which was to be built by Lanyon had expired, and demanded that forty tons per day be delivered to them, as provided in the contract; that notwithstanding the warning and notice the Southern Fire Brick and Clay Company constructed its plant and placed the product upon the open market for sale. It is further alleged that the complainants were the first persons to introduce and place upon the market fire clay of this quality under the name of "Dome Fire Clay" as a trade-mark, and they had built up a large trade therein, and the Southern Fire Brick and Clay Company had entered the market in direct competition with the complainants, and represented that it would sell at reduced prices the same clay under the same name. The complainants further alleged that they were ready, willing and able to accept and handle the fire clay to be furnished by the contract, but that the first and second parties had failed and refused to deliver it, the prayer being for an injunction, as above stated.

The answer of the defendants admitted most of the material allegations of the bill, but denied that complainants had any interest in or lien upon the lands in controversy and averred they had an adequate and complete remedy at law. Issue being joined, the cause was referred to a master to take the evidence and report his conclusions. On January 18, 1904, during the taking of the evidence, the defendant Lanyon notified the complainants, in writing, that he had

constructed on his lands described in the contract, a plant, and was ready to enter upon and carry out his part of the contract and awaited the order of the complainants.

The master, in his report, found that the bill was filed to secure the specific performance of the contract and for an injunction to restrain the violation of the negative covenants thereof; that such an action would not lie; that the injunction prayed for would not obtain fire clay for the complainants, but would merely prevent the defendants from selling the same elsewhere; also that the complainants had an adequate remedy at law. On the coming in of that report the cause was re-referred to the same master and additional evidence taken and a second report made, in which the master found that the contract was in the form of a trust in restraint of trade, and that the sole object of the complainants' bill was, not to obtain fire clay, but to prevent the defendant company from entering the market in competition with complainants. Objections were filed to the report, which stood as exceptions, and they were overruled by the chancellor and the bill dismissed. The complainants prosecuted an appeal to the Appellate Court for the First District, where the decree of the superior court was reversed. This appeal is from that judgment of reversal.

BEACH & BEACH, for appellant the Southern Fire Brick and Clay Company.

J. M. CAMELON, for appellant Dick N. Lanyon.

EDWIN C. CRAWFORD, and WILLIAM R. BURLEIGH, for appellees.

Mr. JUSTICE WILKIN delivered the opinion of the court:

The first question discussed in the argument of counsel is whether the agreement of September 10, 1901, is a valid contract, as was held by the Appellate Court, or is in restraint of trade and violative of the Anti-trust law of this

State or of the United States, as found by the superior
court, and therefore void.  The appellants, in support of
the latter contention, insist mainly upon that part of the
contract by which the first party agrees not to operate any
other fire clay grinding plant on any land owned or con-
trolled by him in the State of Indiana or to sell to any other
person during the time of the contract, and in which the
third, fourth and fifth parties agree not to buy fire clay pro-
duced in that State other than from the first and second
parties.

The Federal statute which, it is claimed, prohibits such
a contract, provides that "every contract or combination in
the form of a trust, or otherwise, or conspiracy in restraint
of trade or commerce among the several States or with for-
eign nations, is hereby declared to be illegal."  The statute
of this State provides: "If any corporation organized under
the laws of this or any other State or country for trans-
acting or conducting any kind of business in this State, or
any partnership or individual or other association of per-
sons whosoever, * * * shall enter into, become a member
of or party to any pool, agreement, contract, combination
or confederation to fix or limit the amount or quantity of
any article, commodity or merchandise to be manufactured,
mined, produced or sold in this State, such corporation, part-
nership, or individual or other association of persons shall
be deemed and adjudged guilty of a conspiracy to defraud,
and be subject to indictment and punishment, as provided in
this act."  (Hurd's Stat. 1905, par. 269*a*, p. 725.)

The object of these statutes is to prohibit the formation
of trusts and combinations and remove all obstructions in
restraint of trade and free competition.  It was not the pur-
pose of either law to hinder or prohibit contracts on the part
of corporations or individuals made to foster or increase
trade or business.  But a contract may incidentally restrain
competition or trade without violating the statutes if its
chief purpose is to promote and increase the business of

those who enter into it. "Agreements in general restraint of trade are void, but those in reasonable partial restraint, founded upon a valid consideration, may be sustained. But this rule does not apply to corporations engaged in a public business. A contract embracing parts of several States, and contracts to sell the goods of a certain manufacturer, not to lease a certain store for a particular business, not to transact a particular business in a certain town, particularly if the period is limited, agreements that certain land shall not be used for ferry purposes, and an agreement by a physi-·cian not to practice within a six-mile territory, have been held valid. Agreements not to do business in a certain State or elsewhere where it would compete with a certain person, agreements embracing an entire State and agreements confined to a certain territory, where such territory is the only one in which the business may be carried on, have been held invalid." (2 Ill. Cyc. Dig. 658, sec. C, and cases cited in notes.) The authorities agree that contracts in partial restraint of trade, in order to be valid, must be reasonable as to time, place, terms, etc., manifesting an intention to simply protect the party relying upon the covenant in the reasonable restraint of unjust discrimination against him. Such contracts usually grow out of sales of property with the good will of a business, profession, partnership, etc., but they are not confined to such contracts. Speaking of the Federal statute in the well considered case of *Whitwell* v. *Continental Tobacco Co.* 125 Fed. Rep. 454, it is said: "If it [the contract] promotes or accidentally restrains competition while its main purpose and chief effect are to foster the trade and increase the business of those who made and operated it, then it is not a contract, combination or conspiracy in restraint of trade within the true meaning of this act, and is not subject to its denunciation."

Are the foregoing terms of the contract of September 10, 1901, violative of the law under the rules of construction above set forth?—that is, are the restrictions partial, reason-

able, and calculated to foster the business rather than to destroy competition? Looking into the facts and circumstances surrounding the parties at the time the contract was entered into, we find that Lanyon, the first party, possessed a large tract of land containing fire clay in the State of Indiana which was undeveloped and produced no adequate income as compared with its capabilities. He had the money to develop it and make it productive, but was without experience in the business of dealing in the product and without means, within himself, of obtaining a market for the same. Heber and Bonebrake were experienced miners of fire clay and in a small way engaged in the business, which, if properly extended, would make Lanyon's property valuable. The appellee corporations had for many years been engaged in selling the product and were looking for opportunities to increase their business. Naturally the several interests of these parties drew them together and prompted them to make the contract in question. It was of mutual benefit and advantage to each of them. Without it each party would labor at a disadvantage and fail to realize the full limit of his or its resources and opportunities. The contract seems just and reasonable in the light of these facts. The corporations might reasonably refuse to enter into the contract or purchase the forty tons of fire clay daily unless they could be protected against the selling of the same product by Lanyon in competition with them. The contract was to run for eight years,—a time not unreasonable for the development of the business entered upon. The limitation applied to only about 180 acres of land in a territory of many hundreds of acres underlaid with the same fire clay deposits. The contract in no way sought to control the labor or experience of all or any considerable number of experienced fire clay workers. The evidence also shows that large deposits of this same fire clay are found in localities outside of the State of Indiana,—*i. e.,* in Illinois, Ohio, Pennsylvania, and perhaps other States. Considering the contract as a whole, in

the light of the facts surrounding the parties, we are of the opinion that it is not invalid; that the object of it was to foster and establish a legitimate business, and although to a limited extent it may have restrained competition, there was not such a limitation or restriction as should defeat its validity under the law.

It needs little argument to show that the case is clearly distinguishable from that of *Arnot* v. *Pittston and Elmira Coal Co.* 68 N. Y. 558, relied upon by counsel for appellant and said by them to be absolutely and directly in point. In that case, as found by the referee, the purpose of the defendant in making the contract was to so control the shipment and supply of coal for the Elmira market as to maintain an unnaturally high price of coal in that market and to prevent competition in the sale of coal therein, and but for that purpose the defendant would not have entered into the contract with the Butler Colliery Company. In this case, as we understand the facts, there was no such purpose or intention whatever. That case is distinguishable from this in other material facts.

The next substantial ground of reversal insisted upon is, that the bill in this case is, in fact, one for the specific performance of the contract set up, and that the terms of that contract are such that they cannot be specifically enforced in equity; also, that complainants have a complete and adequate remedy at law. The bill, on its face, shows that the relief sought is an injunction restraining the defendants from mining or selling any of the fire clay in violation of the foregoing provisions of the contract. The agreement on the part of Lanyon not to operate any other fire clay grinding plant on any land owned or controlled by him in the State of Indiana or to sell to any other person during the time of the contract is a direct negative covenant, and while a court of equity might not compel him to mine and sell the product to complainants in conformity with his agreement, yet there is equitable jurisdiction to prevent him from sell-

ing to other parties. This is not an implied negative agreement, but one clearly and directly expressed.

In the early case of *Lumley* v. *Wagner,* 1 DeG., McN. & G. 604, a case against an opera singer, the lord chancellor said: "It is contended that the plaintiff's remedy, if any, is at law; but it is no objection to the remedy by injunction that the plaintiff may have a legal remedy. * * * Whenever this court has not proper jurisdiction to enforce specific performances it operates to bind men's consciences, as far as they can be bound, to a true and literal performance of their agreements, and it will not suffer them to depart from their contracts at their pleasure, leaving the party with whom they contracted to the mere chance of the damages the jury may give. * * * It is true, I have no means of compelling her to sing; but she has no cause of complaint if I compel her to abstain from the commission of an act which she has bound herself not to do. The jurisdiction which I now exercise is wholly within the power of the court."

In *Singer Sewing Machine Co.* v. *Union Button-Hole and Embroidery Co.* 1 Holmes, 253, the defendant company owned certain patent machines for making button-holes, and a factory for manufacturing the machines. It desired a market for the machines, and contracted with the Singer Sewing Machine Company constituting it sole and exclusive agent for the sale of the machines, except only in France and in the city of Boston. The sewing machine company was to supply the market and extend the same. The button-hole company was to furnish the sewing machine company machines as called for, to the full capacity of its factory, at a certain price, to be paid monthly. The sewing machine company had created a market for one thousand machines when the defendant refused to deliver any more, and for the purpose of avoiding the contract conveyed its patent to its co-defendant, Wood, as trustee. Wood had knowledge of the sewing machine company's rights, and it filed a bill praying a decree for the specific performance of the contract and an injunc-

tion against the manufacture and sale of machines except in conformity with the contract. In the decision of the case the court said: "The relief asked is specific performance and injunction. It is ably argued that the complainant is not entitled to a specific performance, and that therefore it cannot have an injunction which is merely auxiliary. * * * If the court cannot order a contract for the making of button-hole machines specifically performed by reason of the impossibility of superintending the details of such a business, it does not follow that the bill may not be retained as an injunction bill. It was formerly thought that an injunction would not be granted to restrain the breach of any contract unless the contract were of such a character that the court could fully enforce the performance of it on both sides. Upon this ground there were many decisions refusing to interfere with contracts for personal services, however flagrant might be the breach of them. * * * But all these cases were overruled by one of the ablest chancellors who has adorned the woolsack, in *Lumley* v. *Wagner.* * * * It is now firmly established that the court will often interfere by an injunction when it cannot decree a performance." The prayer for performance was refused but the injunction ordered. (See, also, *Consolidated Coal Co.* v. *Schmisseur,* 135 Ill. 371.) Numerous decisions from other States might be cited to the same effect.

The right to an injunction for the enforcement of negative covenants in contracts is independent of the question as to whether an action at law will lie or not. (*Diamond Match Co.* v. *Roeber,* 106 N. Y. 473.) There the negative covenant was that the defendant would not engage in business in competition, and having violated the agreement the bill was filed to enjoin him. The court, in sustaining the injunction, said: "In respect to the general question raised, we are of the opinion that the equitable jurisdiction of the courts to enforce the covenant by injunction was not excluded by the fact of the defendant, by contract, having

executed a bond for its performance with a stipulation for liquidated damages. It is, of course, competent for parties to a covenant to agree that a fixed sum shall be paid in case of the breach, and that this shall be the exclusive remedy. The intention in that case manifestly is that the payment of a penalty would be the price of the non-performance and be accepted by the covenantee in lieu of performance. (*Phœnix Ins. Co.* v. *Continental Ins. Co.* 87 N. Y. 400.) But the taking of a bond in connection with the covenant does not exclude the jurisdiction of equity in a case otherwise cognizable, and the fact that the damages are liquidated does not change the rule." In *Roeper* v. *Upton,* 125 Mass. 258, the court says: "Penalty is a mere security for a performance of a contract, and not the price for doing that which the man has expressly agreed not to do. A court of equity fastens upon the real contract and compels the execution of the very thing covenanted to be done."

Nor do we understand that the remedy by injunction to prevent the violation of negative covenants depends upon the subject matter of the contract, but it may relate to any equitable interest in or charge upon property. See *Willoughby* v. *Lawrence,* 116 Ill. 11; *National Bank Note Co.* v. *Hamilton Bank Note Co.* 83 Hun, 593.

It is also insisted that the granting of an injunction will greatly injure the business of appellant the Southern Fire Brick and Clay Company. The evidence shows that after the making of the contract Lanyon began the erection of a plant according to his agreement, which he failed to complete. The contract was placed upon record, and shortly afterwards Lanyon sold a portion of the land to the Southern Fire Brick and Clay Company. At the time of the purchase it had full knowledge of the contract and of the rights of all the parties, including appellees. After its purchase it was warned by appellees that if it proceeded to erect a plant on the lands purchased, appellees would endeavor to protect their rights in the courts, notwithstanding which it pro-

ceeded to erect the plant and place the product upon the market. Lanyon afterwards erected a plant at another place than the one specified in the contract and offered to furnish clay from it as he had agreed to do. No justifiable reason is offered for this breach of faith upon his part, and the appellant corporation is in no condition to claim that it was innocently injured by reason of the injunction. If its business has been or will be injured it can blame no one but itself.

It is next claimed by appellants that the bill was properly dismissed because the appellees had an adequate remedy at law. But this contention is not sustained by the proof. The evidence shows that the Southern Fire Brick and Clay Company was not a party to the original contract and was not bound by it. Appellees could not maintain an action at law against it for damages sustained. It was one of the offenders, if not the chief offender, and was threatening to put the product of its mine on the open market in competition with appellees. If no relief could be obtained at law by way of damages the injury could not be prevented without recourse to equity by injunction, upon the theory that the appellant corporation had full knowledge of the terms of the contract before it purchased the land. As to Lanyon, the bill alleges that by the violation of the terms of the contract appellees have sustained and will sustain irreparable injury. The record is full of evidence as to the financial irresponsibility of Lanyon. He claims himself that he failed to carry out his part of the contract because of his financial inability to do so. If this was true, he certainly was in no condition to respond in damages to appellees in an action at law, and hence they were entitled to equitable relief against him to prevent his doing that which he had solemnly covenanted not to do.

We find no reversible error, and the judgment of the Appellate Court will be affirmed.    *Judgment affirmed.*