(No. 5777. April 1, 1932.)

INDEPENDENT GAS & OIL COMPANY, a Corporation, Appellant, v. T. B. SMITH COMPANY, a Corporation, Respondent.

[10 Pac. (2d) 317.]

B. W. Davis, for Appellant.

Jones, Pomeroy & Jones, for Respondent.

BUDGE, J.—On February 1, 1924, appellant, engaged in the wholesale business of distributing gasoline and lubricating oils and greases, entered into a written contract with respondent, whereby the latter became the local agent of the former for the sale and distribution of appellant's products in the city of Pocatello and surrounding territory, upon a commission basis. This relationship continued thereafter until about January 1, 1929. On July 14, 1930, appellant commenced this action against respondent to recover $165.89, an alleged unpaid balance due for certain merchandise sold and delivered to respondent and unaccounted for, and also to recover $782.09, an alleged unpaid balance for merchandise sold to one Dawson by respondent upon credit in alleged violation of the contract above referred to. In its answer respondent admitted the execution of the contract but denied its violation and the indebtedness. By affirmative defenses respondent pleaded: (1) illegal charges by appellant for which it received no credit, aggregating $690, (2) facts tending to show respondent's release from liability to appellant as to the Dawson indebtedness, (3) waiver of the terms of the contract alleged to have been violated, and (4) estoppel. By counterclaim respondent sought to offset or recover $689.80 on account of alleged unpaid commissions.

Upon the issues thus framed the cause was tried to the court and a jury. Verdict was rendered in favor of respondent for costs and judgment was entered accordingly, from which judgment and from an order. overruling appellant's motion for new trial this appeal is taken.

There is no dispute in so far as the correctness of the items sued upon is concerned. The controversy is limited to two propositions, viz.: First, the right of appellant to charge against respondent certain payments made by appellant to Trist Automobile Company and Bannock Motor Company according to the terms of two certain contracts entered into between appellant and the two respective companies. Second, whether or not appellant waived the

terms of its contract with respondent as to certain credit extended to one Dawson and was estopped by its acts and conduct from relying upon such terms.

Taking up the first question, it appears from the record that on September 18, 1925, appellant entered into a contract with the Trist Automobile Company whereby the latter leased to appellant the sign privileges on the east side of its building for a term of three years for $30 per month, payable monthly, the Trist Automobile Company agreeing to purchase from appellant all gasoline, kerosene, lubricating oils and greases handled, sold or distributed by it in the city of Pocatello during the term of said lease, except such oils and greases as were then handled by it. The evidence discloses that the sign privileges were never exercised by appellant.

On December 8, 1927, appellant entered into an agreement with Bannock Motor Company whereby appellant agreed to deliver and lease to Bannock Motor Company for a period of three years certain gasoline pumps and gasoline station equipment, to be installed and used only by the latter on its property and place of business at Pocatello during the life of the contract, the title to the leased property to remain in appellant, conditioned that at any time prior to or at the expiration of the contract the Bannock Motor Company should have the right to purchase such equipment at stipulated prices. The Bannock Motor Company further agreed, during the life of the contract, to purchase from appellant all gasoline sold or distributed on its premises through such equipment at prevailing market prices, not to sell or give away from said premises during the term of said contract any gasoline of any kind whatsoever except as might be purchased from appellant, and to encourage, promote, advertise and push the sale of appellant's gasoline. It was further stipulated that the sale of appellant's gasoline and products was the principal consideration for the covenants of this agreement. Appellant agreed, during the life of the contract and while the

covenants thereof were complied with, to pay to Bannock Motor Company $60 per month, payable monthly.

Pursuant to verbal agreement, confirmed by letter by appellant, it was agreed between appellant and respondent that the $30 monthly payment required to be made by appellant to Trist Automobile Company under the contract above referred to should be paid by appellant, charged to respondent and deducted from the latter's monthly commissions.

It was verbally agreed between appellant and respondent that the $60 monthly payment required to be made by appellant to Bannock Motor Company under the contract above referred to should be paid by appellant, and one-half of that amount, to wit, $30, should be charged to respondent and deducted from its monthly commissions.

Monthly payments were made by appellant to Trist Automobile Company and Bannock Motor Company from the dates of and pursuant to their respective agreements, and the charges as agreed between appellant and respondent were made against the latter and deducted from its monthly commissions. Respondent, claiming such deductions to be illegal and based on unenforceable contracts, now seeks to offset the same against the alleged indebtedness due to appellant and to recover the excess over said indebtedness.

No reference is made in the pleadings to the respective contracts between appellant and Trist Automobile Company and Bannock Motor Company, and the question of their validity arose during the trial and upon their introduction in evidence. At that time the trial court reached the conclusion that these contracts were in violation of the anti-trust law (C. S., sec. 2534) and in restraint of trade, and of its own motion struck from the record these contracts and other documentary and oral evidence relating thereto, and denied to respondent the relief sought in its counterclaim, in which it sought to set off or recover the alleged illegal payments made to appellant, such action of the court being evidently upon the theory that the contracts

were unenforceable and that all payments made in pur- · surance thereof were illegal payments.

Appellant urges that neither of the above-mentioned contracts contravened C. S., sec. 2534, which provides, *inter alia,* that:

"Every person, corporation, . . . . engaged in business within this state, who shall enter into any contract, combination or conspiracy or who shall give any direction or authority to do any act, for the purpose of driving out of business any other person engaged therein or who for such purpose shall in the course of such business sell any article or product at less than its fair market value, or at a less price than it is accustomed to demand or receive therefor in any other place under like conditions . . . . shall be deemed guilty of a misdemeanor . . . . "

The anti-trust law was enacted to carry out the provisions of art. 11, sec. 18, of the Constitution. Its purpose, as far as concerned here and as expressed in the title of the act (Laws 1911, chap. 215), is "to protect trade and commerce against unlawful restraint and monopolies." The act inhibits the enforcement of contracts entered into for the purpose of fixing the price or regulating the production of articles of commerce or products of the soil and thereby driving out of business other persons engaged in like business, or selling any article or product at less than its fair market value or at a less price than it is accustomed to demand or receive therefor in any other place under like conditions, resulting in restraint of trade to the extent that the public is injured thereby.

After carefully studying the provisions of the two contracts one feature, at first glance, might possibly seem repugnant to the provisions of C. S., sec. 2534, namely, the provision contained in each contract for the exclusive handling and sale of appellant's products by the Bannock Motor Company and Trist Automobile Company respectively. While there are authorities to the contrary, usually the result of the addition of clearly obnoxious contractual pro-

visions, the rule, would seem to be that a contract creating an exclusive agency for the sale on commission of a given commodity in a specific territory and binding the agent not to sell the goods of any other manufacturers is not within the condemnation of either the common law or of the state and federal anti-trust acts. (19 R. C. L. 142, sec. 107.) Contracts for the exclusive sale of gasoline and oil, similar to those here in question, have been held valid and enforceable and not in violation of the common law or anti-trust acts in the following cases: *Montgomery v. Creager,* (Tex. Civ. App.) 22 S. W. (2d) 463; *Quincy Oil Co. v. Sylvester,* 238 Mass. 95, 14 A. L. R. 111, 130 N. E. 217; *McQuaig v. Seaboard Oil Co.,* 96 Fla. 275, 118 So. 424; *Cox, Inc., v. Humble Oil & Refining Co.,* (Tex. Com. App.) 16 S. W. (2d) 285; *State v. Gulf Refining Co.,* (Tex. Civ. App.) 279 S. W. 526 (followed in companion cases of *State v. Texas Co.,* (Tex. Civ. App.) 280 S. W. 1119, and *State v. Producers Refining Co.,* (Tex. Civ. App.) 281 S. W. 1118); *Standard Oil Co. v. Federal Trade Commission,* 273 Fed. 478, 17 A. L. R. 389; *Canfield Oil Co. v. Federal Trade Commission,* 274 Fed. 571. Similar contracts involving other commodities have been held not to be in violation of the common law or anti-trust acts in the following cases: *Peerless Pattern Co. v. Gauntlett Dry Goods Co.,* 171 Mich. 158, 136 N. W. 1113, 42 L. R. A., N. S., 843; *Wieboldt v. Standard Fashion Co.,* 80 Ill. App. 67; *Trentman v. Wahrenburg,* 30 Ind. App. 304, 65 N. E. 1057; *Christ Diehl Brewing Co. v. Konst,* 30 Ohio C. C. 782; *Walter A. Wood Mowing & Reaping Machine Co. v. Greenwood Hardware Co.,* 75 S. C. 378, 55 S. E. 973, 9 L. R. A., N. S., 501; *Celli & Del Papa v. Galveston Brewing Co.,* (Tex. Com. App.) 227 S. W. 941; *Sullivan v. Rime,* 35 S. D. 75, 150 N. W. 556; *Lanyon v. Garden City Sand Co.,* 223 Ill. 616, 79 N. E. 313; *Newell v. Meyendorff,* 9 Mont. 254, 18 Am. St. 738, 23 Pac. 333, 8 L. R. A. 440. Even conceding that the payments made by appellant could be considered as rebates, such rebates would not be in violation

of C. S., sec. 2534, and we have no statute in this state prohibiting the payment of rebates except to common carriers.

The contracts in question do not disclose a combination or conspiracy, neither does it appear in the pleadings or proof or from the contracts themselves that it was the purpose of the parties to said contracts to interfere with or drive out of business other persons engaged in like business. There is no evidence to the effect that Trist Automobile Company had any other place of business than the one referred to in its contract and the Bannock Motor Company was only limited to the exclusive sale of appellant's products through the leased equipment during the life of the contract which provided for its termination by purchase of the equipment. Thus, as said in *Quincy Oil Co. v. Sylvester, supra:*

"The contract under consideration was not invalid merely because the plaintiff offered the loan of the pump, valued at $452, to induce the defendants to sell its gasoline exclusively. See *Butterick Pub. Co. v. Fisher,* 203 Mass. 122, 133 Am. St. 283, 89 N. E. 189. It cannot be said that this, and the restriction that other oil should not be used in the plaintiff's pump, were greater than was necessary for its protection. The defendants had the use of the equipment free of charge, and paid only the current market price for the gasoline. They were free to terminate the contract at any time by purchasing the equipment. On the facts disclosed we cannot say that the agreement was unreasonable as between the parties or prejudicial to the interests of the public."

Neither does it appear that the products of appellant were to be sold at a price less than their fair market value or at a less price than it was accustomed to demand or receive therefor in any other place, and there is a total absence of proof that the public or any part thereof would be injured as a result of the contracts, or that the contracts resulted or tended to result in the restraint of trade or competition. The gist of the statute is to protect the public against

monopolies, unlawful competition and unreasonable restraint of trade. The court will take judicial notice of the population of cities (23 C. J. 161, sec. 1987), including the city of Pocatello, and the fact that there are many other concerns dealing in like commodities there and doing a wholesale and retail business, for the purpose of determining the likelihood or possibility of a monopoly being created or competition stifled to the injury of the public, in the absence of evidence to the contrary.

We are wholly unable to arrive at the conclusion that the ruling of the trial court can be sustained under the facts disclosed, and therefore conclude that the court erred in striking out the contracts in question and matters relating thereto.

■■ The second question here for consideration is disposed of in a memorandum opinion denying the motion for new trial, written by Judge Robert M. Terrell, covering the questions relating to waiver and estoppel, which we hereby approve and adopt, as follows:

"The verdict of the jury in favor of the defendant in this case under the instructions of the court must of necessity have been arrived at on the part of the jury either on the theory that the defendant sustained the burden of proving in the case its affirmative defense of waiver or else its affirmative defense of estoppel.

"The ground seriously urged by the plaintiff in its motion for new trial is that the evidence received in the case is insufficient to support the verdict of the jury upon either the theory of waiver or the theory of estoppel.

"It has been well said in the brief of counsel for the plaintiff that 'the dividing line between waivers implied from conduct and estoppels is often shadowy as the two terms have come to be quite commonly used interchangeably; that when the term waiver is so used the elements of estoppel almost invariably appear, and it is employed to designate not a pure or express waiver, but one which has come into the existence of effectiveness through the application of the principles underlying estoppels.'

"The only distinction that I can observe between an implied waiver such as pleaded here and estoppel would seem to be that in the case of an implied waiver there must be some conduct on the part of the person waiving from which it may be inferred that the person waiving intended to waive; in other words, affirmative action on the part of the person waiving indicating an intention to waive some benefit or advantage; whereas, in estoppel a barrier is simply set up regardless of the parties' intentions which precludes one from asserting a right which he would otherwise have but for the matters and things pleaded by the way of estoppel, if such matters and things are properly pleaded and proven. In other words, it is conceivable that an estoppel might sometimes apply in a case where at the same time the evidence would not support the conclusion that some right had been impliedly intentionally waived.

"I will examine the evidence briefly in this case with reference to both the defenses of waiver and estoppel, and will adopt the definition of waiver as quoted by counsel for the plaintiff to the effect that a waiver is the intentional relinquishment of a known right. It is a voluntary act and implies election by the party to dispense with something of value or to forego some right or advantage which he might at his option have demanded and insisted on.

"With this definition in mind I will review some of the evidence which it seems to me justifies the conclusion that there is sufficient evidence in the record to support the verdict of the jury in this case on the theory that the defendant had established its defense of waiver.

"The contract between the plaintiff and the defendant whereby the defendant was made the selling agent of the plaintiff in this territory provided that the defendant should only sell the products of the plaintiff for cash unless permitted in writing by the plaintiff to do otherwise. A modification of this provision was had as appears by plaintiff's exhibit F, a letter dated July 19th, 1927, whereby authority was given the defendant company to extend credit to one

T. K. Gunnell. In this letter the plaintiff used this language: 'Please see that the settlement basis does not exceed one week.' This authority to extend credit to Gunnell was made applicable to L. C. Dawson by plaintiff's exhibit H, a letter dated August 6th, 1927. In this letter it appears that Mr. Hone, the agent of the plaintiff, had given his company the information that L. C. Dawson was actually operating the station at Schiller and that Gunnell was guarantor for Dawson. In the previous letter extending credit to Gunnell the plaintiff noted that its previous experience with Mr. Gunnell as a credit risk was satisfactory. In this letter extending credit to Gunnell the plaintiff said to the defendant company: 'Please see that the settlement basis does not exceed one week.' This language may not be particularly significant, and yet it would seem that if it was the intention of the plaintiff to extend credit to Gunnell and subsequently to Dawson, only upon the condition that settlement should be made on a weekly basis, that it would have said in effect that the extension of credit to Gunnell and Dawson is upon the express condition that settlement be made upon a weekly basis, but the language employed, 'Please see that the settlement basis does not exceed one week,' would seem merely to indicate a desire on the part of the plaintiff that it endeavored to have the settlement made upon such basis. Under this arrangement whereby credit was extended to Dawson with Gunnell as guarantor, and with the request that settlement be made upon a weekly basis, plaintiff's exhibit C, the ledger account of L. E. Dawson kept by the plaintiff, shows merchandise begun to be sold to Dawson on August 6th, 1927, and a large quantity of merchandise furnished totaling something over two thousand dollars, to and including August 31st, with two credits against this merchandise over this period, viz.: $225.00 on August 19th and $1,000.00 on August 31st. During this time it is apparent that no settlement was made upon a weekly basis, and if it was the intention of the plaintiff to positively require settlement of the

Dawson account to be made upon a weekly basis, it does not seem reasonable to suppose that the plaintiff would have permitted said policy to have been so soon departed from. But, on the contrary, such action and conduct seems to be in line with the expression in their letter expressing a desire that such settlement be made upon said weekly basis, a circumstance to which the jury might give considerable weight in determining whether or not the plaintiff had waived the settlement of the Dawson account on the weekly basis.

"On September 1st, 1927, the plaintiff wrote the defendant company, plaintiff's exhibit J, complaining about the status of the Dawson account, in which they stated that sales amounted to $1960.55 and no collections. Plaintiff further stated that such line of credit was unnecessary and that they were not desirous of any such credit limit being allowed Mr. Dawson, and furthermore that it was entirely contrary to instructions previously given the defendant, and demanding a reduction of the account. If the actions and conduct of the defendant at this time amounted to a breach of contract as modified with respect to extending credit, it seems logical that the plaintiff should have charged their T. B. Smith Company, agency account with the amount of credit which they claim was improperly extended, but this was not done, and was never done, until July 31st, 1928, as disclosed by the T. B. Smith Company Agent account, plaintiff's Exhibit B in this case, and notwithstanding this complaint registered in plaintiff's letter of September 1st, 1927, further credit was extended to L. C. Dawson as shown by the account, plaintiff's exhibit C, from September 9th to and including September 20th of $1097.70, and during this time there was one cash credit of $700.00 on September 9th, again evidencing notwithstanding the protest letter, the further extension of credit to Dawson, and again some evidence which the jury was entitled to consider as bearing on the question of whether or not the weekly settlement basis was waived.

"Apparently a copy of the letter of the plaintiff company to the defendant company dated September 1st, 1927, plaintiff's exhibit J, was sent by the plaintiff company to its agent Mr. Hone at Tremonton, Utah, with this memoranda written thereon: 'Dear Ted: Please advise this office just the necessity of such a line of credit and where we are going to get off on it, as it is entirely out of reason and a senseless proposition to allow such a credit to an unsecured account as indicated in this letter. (Signed) S. N. R.' which is another bit of evidence which in my judgment, the jury was entitled to take into consideration with reference to whether or not the plaintiff company was extending this credit to Dawson. Incidentally, it might be mentioned that while it is said in this memoranda to Hone that the account was unsecured, nevertheless the previous exhibits hereinbefore referred to show that the account was not wholly unsecured, but was guaranteed by Gunnell, and this might be considered by the jury in connection with all the other evidence as bearing on the willingness, or otherwise, of the plaintiff corporation to extend credit to Dawson.

"No credit was extended to Dawson after September 20th, 1927, but numerous payments were made upon the account as appears by the credits thereon down to July 26th, 1928, at which time the account had been reduced to $782.09, and on July 31st, 1928, this $782.09 was charged to the Smith account and credited to the Dawson account thereby closing the Dawson account on the books of the company.

"At the conclusion of the Dawson account it further appears that the plaintiff company through its agent took over the assets of Dawson at his filling station without accounting to the defendant therefor, which is another circumstance tending to indicate that the plaintiff regarded the Dawson credit risk as theirs, because if the Dawson account was a credit risk of the defendant company it would seem that the plaintiff under its contract would merely hold the defendant liable as its selling agent and let the defend-

ant worry about collecting the balance on the Dawson account, which was not done.

"Finally, it appears from the Dawson account that the plaintiff company did $3,719.75 worth of business with Dawson and received $2933.66, a fairly sizable volume of business for the service station involved. A loss of $782.09 was sustained on this account. The question involved in this case is, who should sustain that loss, the plaintiff or the defendant? If the proof justifies the finding of the jury that the plaintiff waived a settlement on the Dawson account on the weekly basis, then necessarily the plaintiff would have to sustain this loss; and likewise, if the actions and conduct of the plaintiff with reference to the handling of this account and the taking over of the assets of Dawson without accounting for the same justifies the finding by the jury, then the plaintiff under the circumstances is estopped to charge this loss to the defendant.

"I think there is sufficient evidence in the record to justify the jury in so holding upon either theory."

The following additional circumstances were entitled to consideration by the jury: a separate ledger sheet kept by appellant covering the Dawson account shows on its face that the Dawson account was upon a thirty-day credit basis, and evidently so considered by appellant; the fact that a separate ledger account was kept by appellant for Dawson; the fact that certain accounts payable to Dawson from his customers were delivered to one of appellant's attorneys for collection by its agent, the attorney advising appellant by letter that he had received these accounts from its agent and held them for collection; and the fact that some fifty gallons of gasoline at the service station operated by Dawson were turned over to Gunnell by the agent of appellant without any credit being given to the respondent therefor.

■■ Waiver is a mixed question of law and fact. It is the duty of the court to charge and define the law applicable to waiver but it is the province of the jury to say whether the facts of the particular case constitute waiver as

defined by the court. (40 Cyc. 270; *Troendly v. J. I. Case Co., ante,* p. 578, 8 Pac. (2d) 276.) This is also true of estoppel. (21 C. J. 1253, sec. 270.) The court defined waiver and estoppel and the law applicable thereto in its instructions, to which no objections were made. The jury reached its conclusion upon conflicting evidence and found either that there was a waiver of the terms of the contract or that appellant was estopped by its acts and conduct from enforcing the strict terms of the contract. Under such circumstances, where there is sufficient evidence, if uncontradicted, to support such verdict, as in this case, this court will not disturb the verdict or the judgment based thereon. (*Petersen v. Swanson,* 51 Ida. 49, 1 Pac. (2d) 630; *Boomer v. Isley,* 49 Ida. 666, 672, 290 Pac. 405, and cases therein cited.)

Appellant is entitled to judgment for the item of $165.89, with interest, since no other defense was made thereto except the illegality and unenforceability of the contracts to which we have referred. In other respects the judgment is affirmed. Each party to pay its own costs.

Lee, C. J., and Givens, Varian and Leeper, JJ., concur.

Petition for rehearing denied.