429 P.2d 407

**T. L. COOK, Plaintiff-Respondent,**

v.

**WESTERN FIELD SEEDS, INC., a corp., Melvin R. Stolquist, Anne E. Stolquist and Norris E. Stolquist, individually and as Trustees of Western Field Seeds, Inc., a defunct corp., and Union Seed Co., Defendants,**

**Union Seed Co., Defendant-Appellant.**

**No. 9698.**

Supreme Court of Idaho.

June 19, 1967.

Schiller, Young & Williams, Nampa, and Richards, Haga & Eberle, Boise, for appellant.

Gigray, Boyd & Downen, Caldwell, for respondent.

McQUADE, Justice.

The real parties concerned in this appeal are Union Seed Co., appellant, and T. L. Cook, respondent.

On January 23, 1961, Western Field Seeds, Inc., purchased approximately 80,-000 pounds of alfalfa seed from respondent. Part payment was made at the time of sale; for the balance, Western gave respondent its note, maturing on August 1, 1961, secured by two mortgages: one covering machinery and equipment supposedly located in Western's seed-processing plant at Caldwell, Idaho, and the other on the seed itself. A few days later, Western sold the seed to appellant.

Western did not honor its note and respondent brought a successful action to foreclose the mortgage covering Western's machinery and equipment, but the foreclosure sale recovered a relatively insignificant sum. Then on December 27, 1961, respondent, claiming ownership under the seed mortgage, demanded that appellant return the seed or pay respondent its value at the date of appellant's purchase. After this demand was refused, respondent brought an action against appellant for conversion of the seed. Appellant denied actual knowledge of the seed mortgage at the time when it had purchased the seed, and argued affirmatively that respondent had waived his seed mortgage. The trial court entered judgment for respondent, finding that at the time of appellant's purchase, the seed mortgage was recorded as required by law, thereby affording constructive notice thereof. This is an appeal from that judgment.

Included among appellant's assignments of error is its contention that the trial court should have found respondent waived his mortgage on the seed by certain statements made to one Sewell Erskine. Ap-

pellant's argument is correct, this Court decides, and requires reversal; appellant's other points thus need not be considered. The facts pertinent to waiver are hereinafter presented.

During January 1961, Melvin R. Stolquist, the president and managing officer of Western Field Seeds, Inc., traveled from Western's place of business in Caldwell, Idaho, to Sunnyside, Washington, where respondent had several farms and his own 250 ton seed warehouse, and there negotiated with respondent for sale of the seed which is the subject matter of the present controversy.

On January 23, 1961, respondent contracted to sell to Western, through Stolquist, 80,000 pounds of Ranger Alfalfa Blue Tag seed at thirty cents per pound, for a total price of $24,000. Stolquist, as Western's president, made a down payment by check in the amount of $5,600 and gave Western's promissory note due August 1, 1961, for the $18,400 balance. As security for the note's payment, Stolquist and his wife, Western's secretary, executed two chattel mortgages on behalf of Western. One of these mortgages covered various items of machinery and equipment, valued at $86,000 in an appraisal which Stolquist showed respondent and his attorney. The other mortgage was upon the seed itself.

Sometime between the 23rd and 25th of January, 1961, the seed was loaded on a railroad car at Sunnyside, Washington, and on January 25, 1961, Stolquist had an order bill of lading issued by the railroad. The bill of lading was consigned to Western's order and stated that the seed was "TO BE DIVERTED AT CALDWELL IDA[HO]."

During the morning of January 26, 1961, Stolquist, then in Boise, Idaho, telephoned Luther Bice, appellant's manager, and inquired whether he was interested in purchasing the seed on behalf of appellant.

Bice said yes, and Stolquist immediately drove to appellant's office in Nampa, Idaho, arriving there perhaps one-half hour after the phone conversation.

As the trial court found,

"during the morning hours of January 26, 1961, * * * Union Seed Company [appellant], * * * agreed to buy the seed from defendant, Western Field Seeds, Inc., at 26¢ per pound, provided that the title of Western Field Seeds, Inc., to the seed be free and clear of incumbrances."

Stolquist told Bice that the seed itself was not incumbered, but Bice and his attorney, James E. Schiller, thought it best to investigate further since, as Bice testified, appellant's prior dealings with Stolquist had not been "satisfactory."

Additionally the trial court found that during the morning of January 26, 1961, Schiller telephoned Sewell Erskine, manager of the Albert Dickinson Company, a Sunnyside, Washington, seed enterprise with no interest in the present controversy, and asked him to inquire of respondent, whom he had known "very well" for ten years, whether the seed itself was mortgaged. Erskine immediately went to respondent's home, four miles from Erskine's office, and put the question to him. The discussion that followed is a subject of conflicting evidence. Erskine's testimony contains the following:

"A * * * I told him [respondent] that I had a call from a lawyer-friend of mine in Nampa and there was a question about Stolquist, if he had the right to sell the seed that he was dealing on, and I wanted to find out if Stolquist was free to sell the seed and if Mr. Cook [respondent] had any lien on it, he said he did not have a lien on it, he said, 'I have taken a mortgage on all his real property,[1] and the machinery, and

1. When Stolquist, on behalf of Western, executed the two mortgages discussed herein, one covering machinery and equipment and the other upon the seed itself, he also executed a real property mortgage to secure a pre-existing debt, which was apparently unrelated to the transaction of present concern.

everything, and I feel that I am amply covered,' and I said, 'Mr. Cook, do you know exactly what you have covered—do you know what these mortgages cover?' and 'Do you know the property is there to back these mortgages up?' I said, 'I know Mr. Stolquist and I will try to warn you that I didn't think that the mortgages he held were worth the paper they were written on really.'

"Q What did Mr. Cook say, if anything?

"A He said they [apparently respondent Cook and his attorney] had an appraisal and they felt that they were amply secured.

"Q Did you indicate to him who was going to purchase this [the seed respondent had sold to Western]?

"A At the time I went out there I thought our [Albert Dickinson] company was possibly interested in it and for that reason I wanted to be doubly sure, but I learned at a later date that we were not involved.

* * * * * *

"Q * * * did he [respondent] inform you that there was a mortgage on this seed?

"A He informed me that he had a mortgage on the real property but no mortgage on the seed and he said that he felt he was amply covered * * *.

* * * * * *

"Q * * * After you had your conversation with Mr. Cook on or near the 26th of January, 1961, did you ever see him later?

"A Very often.

"Q Did you ever have a conversation with him concerning this particular seed?

* * * * * *

"A * * * at a later date, he informed me that he had taken a mortgage on this seed, and I told him, 'Tom, you told me once you didn't have a mortgage on it,' and that is about all there was to the conversation.

* * * * * *

"Q And when you went out on this date [January 26, 1961] you did not disclose to Mr. Cook that you were there with reference to an inquiry, you didn't know who was interested in this seed, is that correct?

"A At that time I thought our [Albert Dickinson] company was interested.

"Q But you did not know that this was for Union Seed Company?

"A No.

"Q. And you made no disclosure to him [Cook] they [appellant] were contemplating the purchase of this seed?

* * * * * *

"A I made the disclosure people were interested and they asked me to check.

"Q But who it was you didn't know?

"A I intimated to him that it was our company.

* * * * * *

"Q At this conversation with Mr. Cook on or about the 26th of January, 1961, did you disclose to Mr. Cook that a purchase of this seed—this Stolquist seed—Western Field Seeds —this particular car of seed was being contemplated in Nampa, Idaho?

"A Yes.

* * * * * *

"Q Could it possibly be that Mr. Cook told you that he had a mortgage on this seed and you didn't understand it?

* * * * * *

"A I asked him repeatedly and he said, no, that he had a mortgage on the other property."

Erskine had "been in the seed business continuously since 1940." He supervised the Albert Dickinson Company's purchases of seed, primarily alfalfa, which annually

totaled from three to six million pounds. Erskine is a past-president of the Pacific Seed Association to which "all the main seed companies of the area [seven Western states] belong, practically," he testified, and past-president of the Washington Seed Association. "He is considered reputable and honest, any trade or business we have done with Mr. Erskin [sic] has been satisfactory," testified Stanley E. Lenuson, manager of Allied Seeds Company in Caldwell, Idaho. And in response to the question: "what kind of a person is he?", respondent testified,

"Well, he always paid up, when he said he would give me so much he would give it to me and there were no questions asked."

Respondent recalled Erskine's visit and their discussion about the seed mortgage. He insisted, however, that he had told Erskine the seed itself was mortgaged. Respondent's stepson, who testified that he had overheard the discussion from inside respondent's house, some thirty feet from the outdoor conversation, corroborated respondent's testimony.

■ The trial court found,

"That plaintiff told Erskine that he had no lien or mortgage on the seed; that Stolquist was free to sell same and that he was otherwise secured on the transaction with Stolquist."

This finding, which has elicited no objection from respondent, is corroborated by the testimony of attorney Schiller who said that Erskine had telephoned him between 2:30 and 5:00 o'clock p.m. on January 26, 1961, and "informed me just almost word for word what he testified here * * *." It is also corroborative that soon after Schiller had related Erskine's information to him, Bice completed the transaction. It is interesting too that the trial court found $5,600 from the money owed Stolquist by appellant for its purchase of the seed, was disbursed on behalf of appellant to respondent on February 2, 1961, to replace the down payment Stolquist had given on behalf of Western

in that amount which had been dishonored for insufficient funds.

About the time Erskine at Schiller's request conversed with respondent, a chattel mortgage from Western Field Seeds, Inc., mortgagee, covering the following described property, was filed in the office of the Canyon County, Idaho, recorder:

"80,000 lbs. of Ranger Alfalfa Blue Tag seed. Said personal property to be located in the Mortgagor's warehouse at Caldwell, Idaho."

The trial court found that this mortgage contained an adequate description of the carload of seed in controversy and was timely filed, thereby affording constructive notice of respondent's lien, and also concluded that it had not been waived; thus, the court found, appellant took the seed subject to the mortgage in respondent's favor.

In the view which this Court takes of the present appeal, the central issue concerns only a conclusion of law in which the trial court determined that respondent's conduct, as found from conflicting evidence, including his statement to Erskine that "he had no lien or mortgage on the seed; that Stolquist was free to sell same and that he [respondent] was otherwise secured on the transaction with Stolquist," was not a waiver of respondent's security under the seed mortgage. The trial court's finding regarding respondent's conversation with Erskine is supported by substantial evidence. However, the court erroneously concluded that respondent's conduct as found was not a waiver, and the judgment based on this conclusion must be reversed.

The information given Erskine by respondent contains two elements, either of which as a matter of law constitutes a waiver of respondent's security under the seed mortgage.

■ First, respondent's statement "that Stolquist was free to sell same [the seed]," was in effect an unconditional consent to the seed's sale so that Stolquist conveyed unencumbered title to his purchaser, ap-

pellant. A. J. Knollin & Co. v. Jones, 7 Idaho 466, 63 P. 638 (1900); Peoples v. Whitworth, 41 Idaho 225, 238 P. 306 (1925); Bellevue State Bank v. Hailey Nat'l Bank, 37 Idaho 121, 215 P. 126 (1923); see Idaho Bank of Commerce v. Chastain, 86 Idaho 146, 383 P.2d 849 (1963);[2] see also Annot., Chattel Mortgagee's Consent to Sale of Mortgaged Property as Waiver of Lien, 97 A.L.R. 646 (1935); 2 Jones, Chattel Mortgages and Conditional Sales §§ 465–466 (6th ed. 1933).

█ Secondly, respondent's denial to Erskine that the seed was mortgaged ("he had no lien or mortgage on the seed" but "was otherwise secured on the transaction with Stolquist") must in itself be deemed a waiver of the seed mortgage, considering the present circumstances: their conversation had a serious tone, for Erskine told respondent, "I had a call from a lawyer-friend * *' * and there was a question about Stolquist, if he had the right to sell the seed * * * "and, although not sure of the prospective buyer's identity, he "disclose[d] to Mr. Cook [respondent] that a purchase of this seed—this Stolquist seed—Western Field Seeds—this particular car of seed was being contemplated in Nampa, Idaho"; Erskine "asked him [respondent] repeatedly [if he had a mortgage on the seed] and he said, no, * * * *"; respondent's farming enterprises were substantial and he knew Stolquist was a dealer in seed; and appellant, relying upon respondent's words, altered its position by proceeding to purchase the seed from Stolquist. See Smith v. Washburn-Wilson Seed Co., 40 Idaho 191, 232 P. 574 (1925); Idaho Bank of Commerce v. Chastain, supra; cf. C.I.T. Corp. v. Hess, 88 Idaho 1, 395 P.2d 471 (1964); Independent Gas

& Oil Co. v. T. B. Smith Co., 51 Idaho 710, 10 P.2d 317 (1932). Hopkins v. Hemsley, 53 Idaho 120, 22 P.2d 138 (1933), cited by respondent, is not relevant because there the evidence established that the mortgagee, who recovered a judgment in conversion, did not consent to, nor even know of, the mortgagor's sale until immediately before commencing the action.

The trial court's conclusion of non-waiver was expressly founded on one judicial precedent, Grover v: Idaho Pub. Util. Comm., 83 Idaho 351, 364 P.2d 167 (1961). In the *Grover* case, this Court held that Idaho intrastate motor carriers, whose original permits had been revoked and their routes altered during an inadequate regulatory commission hearing, had not waived their rights to rehearing by operating without complaint under the new permits for five years.

In *Grover* the Court distinguishes between waivers express and implied, and regarding implied waiver it states, quoting from Smith v. Faris-Kesl Const. Co., Ltd., 27 Idaho 407, 150 P. 25, (1915), (which in turn quoted from 27 Cyclopedia of Law and Procedure 262 (1907) ):

" 'What constitutes a waiver is essentially a question of intention. * * * In order to establish a waiver the intention to waive must clearly appear, and a waiver * * * will not be presumed or implied, contrary to the intention of the party whose rights would be injuriously affected thereby, *unless,* by his conduct, the opposite party was misled, to his prejudice, into the honest belief that such waiver was intended or consented to.' " (Emphasis supplied). Id., 83 Idaho at 357–358, 364 P.2d at 171.

2. The following cases also recognize this rule and are not contra, although on their special facts the courts found no waiver: Hoebel v. Raymond, 46 Idaho 55, 266 P. 433 (1928) (mortgagee permitted mortgaged hay to be fed to animals only on condition of strict accounting from proceeds of animals' sale); Western Seed Marketing Co. v. Pfost, 45 Idaho 340, 262 P. 514 (1927) (evidence inferentially showed mortgagee's agreement conditioned on payment directly to mortgagee by mortgagor's purchaser); Saxton v. Breshears, 21 Idaho 333, 121 P. 567 (1912) (mortgagee revoked mortgagor's authority to sell prior to consummation of sale).

Grover cites three cases in which this Court had found no waiver,[3] but in each the party claiming waiver had not been prejudiced or misled to his injury by reliance upon his opponent's conduct. In the present case appellant governed his conduct strictly in accord with information from respondent.

The trial court properly noted that, in the absence of a writing, a chattel mortgagee,

"shall not be held to have waived the lien of such mortgage by consenting to a sale of the mortgaged property by the mortgagor unless the fact of such consent * * * be established by a preponderance of the evidence other than the evidence of interested parties." I.C. § 45–1116.

The court erred, however, by concluding that the statements which it found were made by respondent to Erkskine, "[did] not me[et] the burden of proof required by Idaho Code [§] 45–1116."

■■ The statute speaks to the identity of the utterers of evidence, in effect denying weight to testimony and documents made by "interested parties." See Hopkins v. Hemsley, supra. The term "preponderance of the evidence" (not disqualified as being from "interested parties") connotes no more than the ordinary rule governing the process of fact-finding, that is "such evidence as, when weighed with that opposed to it, has more convincing force and from which it results that the greater probability of truth lies therein." (Big Butte Ranch, Inc. v. Grasmick, 91 Idaho 6, 415 P.2d 48, 51 n. 2 (1966) ). The trial court found from the testimony of Erskine, a person disinterested within I.C. § 45–1116, that respondent had told him during a serious conversation, "he had no lien or mortgage on the seed"

and "Stolquist was free to sell same [the seed]." This finding forces the conclusion that respondent's waiver by consent to the sale was proved within the evidentiary standard of I.C. § 45–1116.

The statute, moreover, concerns only waiver "by consenting to a sale * * *." Respondent's conduct here, as found from conflicting evidence, cannot be termed mere consent; he absolutely denied the existence of a mortgage covering the seed, and, as Erskine testified, did so "repeatedly."

■ The trial court's memorandum decision and respondent's brief stress that the filing of the seed mortgage in the Canyon County recorder's office gave constructive notice of appellant's lien. This misses the point. Respondent's waiver of his seed mortgage during his conversation with Erskine deprived the instrument which embodied his claim of its legal significance regarding the sale to appellant. Thereafter, besides the obvious futility of searching for a mortgage after its mortgagee had said it did not exist, discovery by appellant of the recorded document would have been immaterial for,

"Actual knowledge of the existence of the mortgage could not defeat the purchase or affect the rights of the purchasers, where the sale is made with the consent of the mortgagee. The consent of the mortgagee to a sale of the chattels mortgaged waives the lien of the mortgage as to one who purchases from the mortgagors." A. J. Knollin & Co. v. Jones, supra, 7 Idaho at 473–474, 63 P. at 640 (1900).

Judgment reversed. Costs to appellant.

TAYLOR, C. J., and SMITH, McFADDEN and SPEAR, JJ., concur.

**3.** City of Coeur D'Alene v. Spokane & Inland Empire R.R. Co., 31 Idaho 160, 169 P. 930 (1917); Hawkins v. Smith, 35 Idaho 349, 205 P. 188 (1922); and Neitzel v. Lawrence, 40 Idaho 26, 231 P. 423 (1924).