be found collated under section 337, Branch's Ann. Tex. P. C.)

Appellant attached to his motion for new trial the affidavit of Frank Broll in which the witness swears that he had intercourse with prosecutrix twice on the night of July 28th, which was before appellant's relation with her. One of the requisites of an application for continuance is that it must aver that the witness sought was not absent by the "procurement or consent of defendant." Article 543, Code Cr. Proc. 1925. Appellant under oath made such averment. Appellant knew his case would be called for trial on March 6th. Process was requested for Broll on March 1st. The state also secured an affidavit from Broll which is attached to the state's answer to appellant's motion for new trial. That affidavit reveals that on the night of March 1st Broll—who is appellant's cousin—had a conversation with appellant in which he told Broll that he (appellant) was going to try in some way to put the case off; that witness left because he knew that both appellant and the state were going to try to use him as a witness and he told appellant during this conversation that witness was going to leave; that appellant did not protest against witness leaving but said for witness to use his own judgment about it, and that if witness thought it better to be gone to "go ahead and leave"; that appellant said he "wanted witness in the case but told him to leave if he wanted to." Under such circumstances as here shown we can regard the absence of Broll in no other light than as having been consented to by appellant, if not actually procured by him.

Appellant was indicted on February 22d and arrested the next day, at which time he gave bond. He had been under bond since January 6th on a complaint charging him with unlawful intercourse with prosecutrix. Process for his witnesses was not applied for until March 1st. Appellant undertakes to excuse himself for delay in requesting process on the ground that he could not get in touch with his attorney until the day process was requested, although he had made an effort to do so the day after his re-arrest under the indictment. It appears from the record that the district attorney on February 23d advised appellant that his case would be called for trial on March 6th, and further advised appellant to make application at once for all his witnesses, and was directed to the office of the district clerk for that purpose. Appellant testified on the trial that before he had intercourse with prosecutrix the witnesses for whom he had sought a continuance had told him that they had theretofore had intercourse with her; that he had some of them to go before the grand jury and had talked to them about it before the grand jury had indicted appellant. It is very apparent that appellant himself understood the importance of the presence of the witnesses if he thought they would testify as he claimed to have expected. From the affidavit of Broll attached to the state's answer to the motion for new trial it is shown that this witness talked to Paul Sanders (another of the absent witnesses) on Saturday, February 23d—the very day appellant was arrested under the indictment—and that Sanders sent word to appellant that he (Sanders) was not going to be there when the case was called for trial; that Broll saw appellant the next day which was Sunday, February 24th, and delivered Sanders' message. Notwithstanding this information, appellant waited until March 1st before requesting process. If it had been issued promptly, this witness in all likelihood could have been served. He was gone when process was issued, and appellant had information that he intended to leave. Under the circumstances the trial court would have been justified in doubting if appellant in good faith wanted the witness present; the facts before him, to say the least, lent color to what Broll said in his affidavit, to wit, that appellant "told me he was going to try to put the case off in some way." We think the court correctly held under the circumstances that appellant was lacking in diligence; neither did he abuse his discretion in concluding that, if Sanders and Johnson had been present, they likely would not have testified as expected.

We find no error in the trial court's disposition of the question raised by claimed newly discovered evidence upon the issue of prosecutrix's age, in view of the affidavits relative thereto presented by the state.

The judgment is affirmed.

---

**MONTGOMERY et al. v. CREAGER.**
(No. 617.)

Court of Civil Appeals of Texas. Eastland.
Nov. 1, 1929.

Rehearing Denied Dec. 6, 1929.

Arrington & Johnson, of Mineral Wells, for appellants.

Bouldin & Zivley, of Mineral Wells, for appellee.

FUNDERBURK, J. J. M. Montgomery and L. H. Creager were partners in the business of buying and selling gasoline, motor oil, and automobile accessories, and as to the sale of oil and gas were both wholesale and retail dealers. They owned several separate pieces of property in the town of Mineral Wells and the vicinity thereof, including a number of filling stations. About June 14, 1928, the partnership was dissolved by mutual agreement, and the property owned by the firm was partitioned. In the partition, Montgomery conveyed to Creager all of the partnership property and assets save the Park Filling Station in Mineral Wells. The latter Creager conveyed to Montgomery, the language of the contract vesting same in him reading as follows:

"The party of the second part, J. M. Montgomery, shall have and hold and receive as his part of the property belonging to the parties hereto, the following, to-wit: Park Filling Station on Oak Street * * * together with all the fixtures and property rights of any character, which is now being held by party of the first part and party of the second part; also all outstanding accounts due Park Filling Station."

Under the contract, Creager assumed all the indebtedness owing by the firm existing in connection with the property allotted to him in the partition and certain other items of indebtedness not referable especially to any particular part of the property. Montgomery assumed the firm indebtedness relating to the previous operation of the Park Filling Station. The contract contained two provisions, as follows:

"7. It is further agreed that the said J. M. Montgomery shall purchase all gasoline sold by him at the above named Park Filling Station from the said L. H. Creager at tank wagon prices charged by regular standard oil companys in Mineral Wells, Texas; that all the gasoline purchased by the said J. M. Montgomery shall be purchased from the said L. H. Creager, unless the said J. M. Montgomery should sell said Park Filling Station. It being agreed, however, that the said L. H. Creager shall have the right to sell and the said J. M. Montgomery shall receive said gasoline for a period of at least twelve months from this date, regardless of whether sold or not. If said property is not sold this contract shall remain in force for five years from this date.

"8. It is further agreed that the said L. H. Creager will pay to the said J. M. Montgomery one cent on each gallon of gasoline sold and delivered by him, the said L. H. Creager, to the said J. M. Montgomery."

Montgomery operated the Park Filling Station, purchasing from Creager all the gasoline sold by him at that station, in compliance with the provisions of the contract, up to the date of the filing of this suit, about December 3, 1928. About November 7, 1928, Montgomery sold the filling station to W. A. Ford. This suit was brought by Creager against Montgomery and Ford for an injunction, alleging that the defendants were preparing to remove all pumps, barrels, and tanks belonging to the Continental Oil Company, of which plaintiff was agent, and to replace same with pumps, barrels, and tanks owned by another oil company, and alleged that defendants had notified him that they would not accept any more gasoline or oils from plaintiff. In brief, the purpose of the suit as originally brought, was to require by mandatory process that defendants comply with the obligation of Montgomery under the contract to purchase from plaintiff all of the gasoline sold by him at the Park Filling Station for a period of at least one year. Injunction was granted, substantially as prayed for, but on the 4th day of December, 1928, the court, of its own motion, set aside the part thereof requiring the defendants to receive gasoline from plaintiff. Afterwards, on the 4th day of February, 1929, upon a motion by defendants to dissolve the injunction, the court overruled the motion and restored the injunction as originally granted, thereby setting aside the order of December 4th relieving the defendants from receiving gasoline from plaintiff. Between the 4th day of December, 1928, and the 4th day of February, 1929, while the defendants were absolved from the obligation to take gasoline from the plaintiff, they purchased gasoline elsewhere in such an amount that the plaintiff's commissions thereon

would have amounted to $630. On the 11th day of March, 1929, the case was tried on its merits; judgment was given in favor of the plaintiff against both defendants for said sum of. $630, and the defendants were required to receive all gasoline to be sold and retailed at the Park Filling Station from the plaintiff, in accordance with the terms of the contract. The original injunction was perpetuated, except that part which restrained defendants from removing the pumps and other fixtures of the Continental Oil Company, which was dissolved. From the judgment the defendants have appealed.

Appellants insist in the first place that the judgment of the trial court should be reversed and judgment be rendered for appellants on the ground that the contract, and particularly the provision hereinbefore first quoted, shows an agreement prohibited by the anti-trust laws of this state. Preliminary to a consideration of this question, the provision of section 7 of the contract in question and above set out calls for a construction. Upon a sale of the filling station in less than a year from the date of the contract, Montgomery's obligation to continue for at least one year from the date of the contract to purchase oil of appellee is not clear. It seems certain enough that the contract only obligated Montgomery to purchase of appellee gasoline sold by him at the Park Filling Station. It also seems to be clearly intended by the contract that Montgomery could sell the filling station at any time. The question arises whether the contract sought to place a limitation for one year upon Montgomery's right to sell the business, or whether in case of sale it undertook to impose upon Montgomery some duty to purchase gasoline from plaintiff, regardless of whether he sold it at the Park Filling Station. We do not believe that the contract shows an intention to prohibit absolutely for any length of time the alienation of the property by Montgomery. A more reasonable construction is, we think, that it imposed upon Montgomery, in case he alienated within less than twelve months, the duty to do so upon terms that would require the purchaser to continue to take gasoline from appellee until the expiration of the twelve-month period. The contract we think cannot be reasonably construed as obligating Montgomery to purchase gasoline other than that sold at the particular station, and, unless the contract can be construed as indicated, then we would have to say that the particular provision is ineffective because of being meaningless.

Is the contract as thus construed one creating a trust? Eliminating all elements of a trust that are certainly inapplicable to the case in hand, the statute defines a trust as follows:

"A 'trust' is a combination of * * * acts by two * * * persons * · * * for * * * the following purposes: (1) To cre-

ate or which may tend to create or carry out restrictions in trade or commerce * * * or to create or carry out restrictions in the free pursuit of any business authorized or permitted by laws of this State * * * (3) To prevent or lessen competition in the * * * sale or purchase of merchandise, produce or commodities. * * *." Rev. St. 1925, art. 7426.

" 'Combination,' " says Judge Denman in Gates v. Hooper, 90 Tex. 563, 39 S. W. 1079, 1080, "as here used, means union or association. If there be no union or association by two or more of their 'capital, skill or acts,' there can be no 'combination,' and hence no 'trust.' When we consider the purposes for which the 'combination' must be formed to come within the statute, the essential meaning of the word 'combination,' and the fact that a punishment is prescribed for each day that the trust continues in existence, we are led to the conclusion that the union or association of 'capital, skill or acts' denounced is where the parties in the particular case designed the united co-operation of such agencies, which might have been otherwise independent and competing, for the accomplishment of one or more of such purposes."

It would thus appear that it is not the mere fact of combination in its ordinary sense that is denounced by the statute, but the term includes *design* on the part of the parties to effect the accomplishment of one or more of the prohibited purposes. In the case now before us we have two partners engaged in trade or commerce; namely, the sale at both wholesale and retail of gasoline. It is a fair inference from the pleadings and evidence, if not expressly so stated, that the business carried on at the Park Filling Station was a retail business and that in the partition Creager succeeded to all of the wholesale business of the partnership. The firm of Creager & Montgomery as wholesalers had for one of their customers Creager & Montgomery as retailers of gasoline at the Park Filling Station. With no such provision as that of paragraph 7 in the contract of dissolution and partition, it was easily possible for Creager, the next day afterward, to lose a valuable customer which the partnership as wholesale dealers in gasoline had. To effect such result it would have only been necessary for Montgomery to begin purchasing his gasoline from some other source. Such a course would have permitted Montgomery to immediately detract from the value of the wholesale business he had relinquished to Creager and in consideration of which there had been transferred to him the said Park Filling Station. Undoubtedly, had Montgomery contracted to use his best efforts to turn to Creager all of the customers which, as retail buyers, he and Creager had formerly had in their wholesale business, for a definite period of time, and within a limited area, the agreement would have been valid. Gates v. Hooper, supra; Redlands

Fruit Co. v. Sargent, 51 Tex. Civ. App. 619, 113 S. W. 330; Langever v. United Adv. Corp. (Tex. Civ. App.) 258 S. W. 856; Malakoff Gin Co. v. Riddlesperger, 108 Tex. 273, 192 S. W. 530.

We fail to see in principle any difference in the obligation of Montgomery here involved, which merely had the effect to secure to Creager as wholesaler a customer for a limited time and restricted to the gasoline sold at a particular station, which the firm had at the time of dissolution.

The validity of the contract appears even more plainly upon another ground. For Montgomery's obligation to purchase from Creager all the gasoline he sold at the Park Filling Station for five years if he continued to own it, and for one year if he sold it, there moved to him a valid consideration. In effect he acquired the right to purchase the gasoline at one cent per gallon under the current market prices. Had Creager breached the contract and Montgomery have sought to hold him to fulfillment, Montgomery would occupy the position of a purchaser of the gasoline station, with an agreement by the seller, as a part of the consideration for the sale, that for at least twelve months he would supply him with the gasoline necessary to operate his station at a discount of one cent a gallon under the current market price. It would certainly be an unreasonable interpretation of our anti-trust laws to hold that it prohibits the making of such a contract. If such a contract comes within the prohibitions of the statute, then A, the owner of an automobile, cannot contract with B, his service station man, to purchase all of his gasoline from him for six months in consideration of a 10 per cent. discount from the current market price. The owner of a store and meat market would be denied the right to contract with a cattleman to furnish all the beef required in the business for a period of six months or a year. Although it must be admitted that it is difficult to see the distinction in transactions, some of which have been held to violate the law and others not, we fail to find in the present contract evidence of design to employ the acts of the parties to accomplish any of the things prohibited by the statute. We accordingly overrule the contention that the contract shows a violation of the anti-trust law.

■ The next question is, Was the plaintiff entitled to judgment against Ford, the purchaser of the Park Filling Station, either for the sum of money awarded or the mandatory injunction commanding the continued purchase by him of gasoline from the plaintiff? Appellee seems to interpret the contract in question as one subjecting the Park Filling Station to a restricted use. Anderson v. Rowland, 18 Tex. Civ. App. 460, 44 S. W. 911, and other cases are cited to support the contention that Ford, having knowledge of the provisions of the contract in question, and with

such knowledge having become the owner of the Park Filling Station, he thereby becomes liable to carry out the contract and consequently liable for damages for the breach thereof. We do not believe the view is correct that the contract provides for a restricted use of the filling station. The contract was one for the purchase and sale of gasoline. The filling station is only important as identifying the subject-matter of the contract; namely, such gasoline as is sold at the filling station. The agreement, if it could properly be called a convenant, is certainly not such as attaches to the property, but is purely personal between Creager and Montgomery.

It is true that equity recognizes a kind of convenants which do not run with land, but are nevertheless binding upon subsequent owners of property who acquire same with notice. Pomeroy's Equity, §§ 1295, 698. But even that kind of covenant "must * * * relate to or concern the land or its use or enjoyment. It is not enough that [such] a covenant affects the use of land, or the enjoyment of an easement therein, * * * in a collateral way." Kettle River Ry. Co. v. Eastern Ry. Co., 41 Minn. 461, 43 N. W. 469, 475, 6 L. R. A. 111; West Virginia Transp. Co. v. Ohio River Pipe Line Co., 22 W. Va. 600, 46 Am. Rep. 527. In the first case it was held that an agreement by a landowner that the products of the land be transported exclusively by one company does not so relate to the land as to be binding on purchaser with notice. Such we think is the nature of the agreement we are now considering.

Construing the agreement, as we do, not to come within the class of those discussed by Mr. Pomeroy under the above citations, and of Anderson v. Rowland, supra, the principles that should control are those discussed in cases such as, for instance, G., C. & S. F. Ry. Co. v. Smith, 72 Tex. 122, 9 S. W. 865, 2 L. R. A. 281; Lakewood Heights v. McCuistion (Tex. Civ. App.) 226 S. W. 1109. The covenant or agreement involved in G., C. & S. F. Ry. Co. v. Smith, supra, was one made in connection with the grant of a railroad right of way. Bryan, while owner of the land, had granted a right of way over a large tract, and the railroad had agreed that, whenever any part or the whole of the land was inclosed for pasturage, the railroad company would, within a reasonable time after notice of the intention to make such use of the land, fence their right of way along the portions inclosed for exclusive use as a pasture. Bryan sold the land, and the suit was for damages for breach of this agreement. Recovery was denied on the ground that the agreement was personal between the railroad company and Bryan, and was not a covenant running with the land.

In Lakewood Heights v. McCuistion, supra, in a sale of property, it was agreed by the grantors to furnish to the purchaser electric-

ity, gas, water, sewers, and street car service. On resale of the property, without express assignment of the contract, it was held the purchasers could not hold the original obligors liable.

In the case at bar we construe the contract to declare an unrestricted right on the part of Montgomery to sell the filling station, save only in the sense that there may be a restriction in the obligation of Montgomery to impose upon the purchaser the obligations' of the contract. Having sold to Ford, without obligating Ford to carry out the contract, a case is presented of a breach of contract by Montgomery only.

The judgment of the trial court as to appellant Ford will be reversed and here rendered in his favor. The judgment as to appellant Montgomery will be reformed so as to eliminate the injunction, and, as so reformed, will be affirmed to the effect that plaintiff recover of said Montgomery the sum of $630.