**N.P., INC./Jerald A. TURBOFF, Trustee and Julius Glickman, Appellant/Cross–Appellee,**

v.

**Jerald A. TURBOFF, Trustee and Julius Glickman/N.P., Inc., Appellee/Cross–Appellant.**

**No. 08–99–00140–CV.**

Court of Appeals of Texas, El Paso.

Aug. 30, 2001.

Rehearing Overruled Oct. 10, 2001.

Eric J. Taube, Mitchell Dodd Savrick, Hohmann & Taube, L.L.P., Lynne Liberato, Alene Ross Levy, Haynes and Boone, L.L.P., Kent Geoffrey Rutter, Houston, for appellant.

Paul J. McConnell, III, Ben A. Baring, Jr., DeLange, Hudspeth, McConnell & Tibbets, L.L.P., Julius Glickman, Glickman, Hurlong & Hughes, Houston, for appellee.

Before Panel No. 4 BARAJAS, C.J., LARSEN, and McCLURE, JJ.

### OPINION ON REHEARING

LARSEN, Justice.

This Court's opinion issued September 21, 2000 is withdrawn, and the following is substituted.

This appeal concerns a dispute over the right to reimbursement payments from a Municipal Utility District for utility facilities. N.P., Inc. appeals from a summary judgment granted to Jerald A. Turboff and Julius Glickman (collectively Turboff), finding them entitled to receive proceeds from Harris County Municipal Utility District No. 36 (the MUD) for Turboff's construction of utility facilities now owned by N.P. Turboff appeals the trial court's refusal to compel N.P. to sign a deed conveying the facilities to the MUD. We affirm.

### FACTS

In 1984, Jerald Turboff, a developer, contracted with the MUD to construct water, sewer, and drainage services for a 137 acre tract of land which he was developing. The agreement provided that the MUD would acquire these utilities after they were completed and would reimburse Turboff by issuing bonds. The agreement also provided that the MUD would be under no obligation to purchase the facilities unless, among other conditions, "the facilities have been constructed in accordance with the plans and specifications approved by the District and in a good and workmanlike manner."

To finance the development, Turboff obtained a loan from First Texas Savings Association, secured by a promissory note for 26 million dollars. He spent about two million dollars constructing the utility facilities, but apparently defaulted on the note. In June 1986, First Texas foreclosed on the property.

Turboff and First Texas sued each other. In December 1988, Turboff and First Texas settled all disputed claims between them.[1] In the settlement agreement, First Texas released any claim it might have to proceeds from the 1984 Turboff–MUD

agreement, and confirmed Turboff's ownership of receivables under the MUD contract. First Texas also executed a stipulation of interest, stating that all proceeds payable to the developer under the MUD agreement (referred to as the "MUD Receivable") would be payable to Turboff and Glickman & Barnett. First Texas notified the MUD of the settlements and its release of all claims to proceeds from the 1984 utility agreement, and authorized the MUD to pay all proceeds to Turboff.

In February 1995, First Nationwide Bank, as receiver for First Texas, sold the 137 acres to N.P. The real estate purchase agreement between Nationwide and C.N. Papadopoulos, as trustee for N.P., specifically excluded the reimbursement rights, stating:

EXCLUDING SELLER'S RIGHTS TO REIMBURSEMENT UNDER ANY AND ALL AGREEMENTS BY AND BETWEEN SELLER OR ANY OF SELLER'S PREDECESSORS IN INTEREST TO THE PREMISES AND THE HARRIS COUNTY MUNICIPAL UTILITY DISTRICT # 36 ... FOR ANY IMPROVEMENTS TO THE PREMISES HERETOFORE PERFORMED OR PAID FOR BY SELLER OR ANY OF SELLER'S PREDECESSORS IN INTEREST....

Similarly, the warranty deed conveying the land stated:

This conveyance and the warranty made herein are made and accepted subject to:

. . .

(6) Any right(s) to reimbursement from any municipal utility district, ... for improvements to the Property heretofore performed or paid for by Grantor

---

1. In Turboff's deposition, he averred that the FSLIC placed First Texas in receivership about thirty minutes after this settlement agreement was formalized.

or any of Grantor's predecessors in interest.

After purchasing the property, N.P. entered into a utility purchase agreement with the MUD which specifically referenced the MUD's original 1984 contract with Turboff, acknowledged that N.P. had acquired title to all the land and improvements in the 137 acres, that N.P. was constructing stormwater detention facilities, and might construct additional water, sewer, and drainage facilities. (In his deposition, Papadopoulos testified that when N.P. acquired the property, it was in disrepair. He estimated that N.P. spent $100,000 to repair the existing facilities, and around $500,000 to install additional facilities.) The agreement provided for transfer of the facilities from N.P. to the MUD upon their completion. The agreement provided:

> The District has been notified in writing of the claims of Turboff and his assignees to receive the Purchase Price for the Existing Facilities if, as, when and to the extent that same becomes due and payable pursuant to the terms of the Prior [1984] Agreement. The Developer, as the current owner and holder of title to the Existing Facilities, has also claimed the right to receive such Purchase Price. Accordingly, a controversy exists as to the rightful recipient of the Purchase Price for the Existing Facilities, and notwithstanding the foregoing or any other part or provision hereof to the contrary, the District shall not be obligated hereunder to pay to the Developer all or any portion of the Purchase Price for the Existing Facilities unless and until such dispute covering the rightful payee of the Purchase Price is settled by mutual agreement, finally adjudicated or otherwise resolved to the reasonable satisfaction of the District such that payment of the Purchase Price for the facilities can be made by the District without undue risk of wrongful or duplicate payments.

As in the prior agreement, the MUD was under no obligation to purchase the facilities until it sold sufficient bonds to pay the purchase price.

Turboff and Glickman filed a declaratory judgment action, requesting judgment that Turboff and not N.P. was entitled to the MUD reimbursement, that N.P. be ordered to convey title to the utility facilities to the MUD, and for damages for tortious interference with contract. N.P. counterclaimed for a declaration that it owned the facilities and was entitled to the MUD reimbursements under the 1997 agreement. The parties filed cross-motions for summary judgment urging that each was entitled to the MUD reimbursement payment.

The trial court granted final judgment as follows:

1. It is ORDERED, ADJUDGED and DECREED that all sums due from Harris County Municipal Utility District No. 36 with respect to the Existing Facilities, as defined in that agreement dated February 25, 1997, between Harris County Municipal Utility District No. 36 and N.P., Inc., ('the 1997 Agreement') are rightfully owned by Plaintiffs, Jerald A. Turboff, Trustee, and Julius Glickman, who are the parties entitled to receive such funds.

2. It is further ORDERED, ADJUDGED and DECREED that Plaintiff's request that N.P., Inc. be required by the Court to execute a deed to Harris County Municipal Utility District No. 36 is denied.

3. It is further ORDERED, ADJUDGED and DECREED that N.P., Inc. is the owner of the Facilities, as defined in the 1997 Agreement, subject to the right to reimbursement in favor of

Plaintiffs as described in Paragraph 1 above and all other matters set forth in the deed recorded under Clerk's File No. R288263 in the Official Public Records of Real Property of Harris County, Texas.

4. It is further ORDERED, ADJUDGED and DECREED that Turboff et. al has no right to compel N.P., Inc. to execute a deed conveying the facilities or the Additional Facilities.

Both parties appeal; N.P. urging that the trial court should have awarded it the full MUD reimbursement, as owner of the facilities, and Turboff urging that the trial court should have ordered N.P. to convey title to the MUD.

## N.P.'s appeal

N.P. appeals raising a single issue: Is the fee simple owner of real property, including the facilities built for the provision of utilities, entitled to retain the proceeds of the sale of its facilities to a municipal utility district? Under the specific circumstances presented here, we hold it is not.

 The controlling factor here is N.P.'s notice of Turboff's claim to the MUD reimbursement, and the express reservation of reimbursement rights contained in the deed to N.P. from Nationwide. Dr. Papadopoulos, N.P.'s president and sole shareholder, testified in deposition that:

Q: When did you find out about the outstanding claim to reimbursement by Jerry Turboff, trustee?

A: That was approximately a week or two before we acquired the property, before we closed the property. Sometime in March of—February of '95.

Q: Okay. So was it—do you remember whether it was before or after you signed the earnest money contract?

A: It was after signing the earnest money contract. The earnest money contract was signed on 2/8/95. And I think there is a—in my calendar there is notice of a meeting that I had with the utility district attorney. And that was sometime in February of ... '95.

And, more importantly,

Q: Now, before you executed the earnest money contract did you have any discussions with First Nationwide concerning the outstanding right to reimbursement?

A: Yes.

Q: Okay. What did they tell you?

A: In the process of negotiating this agreement, the purchase agreement, they told us, told me, N.P., that the reimbursables from the district were assigned to a third party.

Q: Okay.

A: And whether they mentioned the name Turboff or not, I don't recall. They could not assign to us the reimbursables from the utility district, whatever the amount was.

Q: And that discussion was carried forward into the earnest money contract, wasn't it?

A: Yes, uh-huh.

Q: So you understood at the time that you were signing the contract to buy the property that you were not getting, or First Nationwide was not conveying to you any right to reimbursement from MUD 36 for the existing utilities?

[Objection omitted].

A: They said that they had assigned the utility reimbursables to a previous party, to someone else, and that in the conveyance of the title I would not be getting that.

Further, the warranty deed to N.P. clearly reserved the reimbursement rights. In conveyances, the clause "subject to" is a term of qualification and limits the estate

granted.[2] Moreover, the 1997 utility agreement between N.P. and the MUD provided that nothing in that agreement would alter, amend, or otherwise affect the prior utility agreement or the rights or obligation of the parties. The MUD specifically provided that it would not be obligated to pay the reimbursement until the dispute between N.P. and Turboff was resolved.

The summary judgment evidence thus established that N.P., through its president and sole owner Papadopoulos, knew it was purchasing property without any right to MUD reimbursement, at least for improvements made before N.P. took title. Papadopoulos testified that *during negotiations* on the purchase agreement, he was told a third party had retained reimbursement rights.[3] N.P. accepted the warranty deed with that express reservation. Presumably, N.P. had the opportunity to negotiate a more favorable purchase price because it would not be receiving the MUD reimbursables.

In arguing to the contrary, N.P. relies upon *Olmos v. Pecan Grove Municipal Utility District.*[4] We find that case distinguishable. In *Olmos,* our sister court held that Pecan Grove, a successor owner, retained title to utility facilities and thus was entitled to the MUD reimbursement proceeds, despite a prior sales agreement between the MUD and the original developer.[5] *Olmos* notes that absent an express restriction or reservation to the contrary, a conveyance of the facilities under a utility construction agreement will include the right to a MUD reimbursement.[6] The conveyance in question there contained no such restriction. Here, however, the instruments of conveyance to N.P. specifically reserved the MUD reimbursements, and N.P. had notice of such exclusions during its negotiations for the property. Thus *Olmos,* rather than supporting N.P.'s position, actually supports an opposite conclusion.

Another case examining this issue is *Phoenix Holdings, Ltd. v. Circle C Land Corp.*[7] There, the court found that appellant Phoenix was not entitled to all MUD payments, but only those for facilities "on or within the land."[8] In so finding, the court noted, citing *Olmos,* that:

> *Absent an express restriction or reservation* to the contrary, a conveyance of the MUD Utility Construction Agreements would include, as an appurtenance necessary to the full enjoyment of the thing conveyed, a right to the periodic payments owed by the MUD.... In the disputed assignment in the present appeal, there exist two express restrictions....[9]

As in *Phoenix Holdings,* here the conveyance documents established a reservation of the MUD reimbursable. N.P. is thus not

---

2. *Walker v. Foss,* 930 S.W.2d 701, 706 (Tex. App.—San Antonio 1996, no writ).

3. We note that the MUD reimbursables were not the only right, title, interest, estate, claim, or demand excluded from this transaction. Also excluded from the sale was "ANY CONDEMNATION AWARD OR DAMAGES RECOVERABLE IN THOSE CERTAIN CONDEMNATION SUITS STYLED: *STATE OF TEXAS VS. FIRST GIBRALTAR BANK, FSB* ...."

4. 857 S.W.2d 734, 740 (Tex.App.—Houston [14th Dist.] 1993, no writ).

5. *Id.* at 736–37.

6. *Id.* at 739–40.

7. 987 S.W.2d 933, 936 n. 6 (Tex.App.—Austin 1999, pet. denied).

8. *Id.* at 937.

9. *Id.* at 936 n. 6 (emphasis in original) (citation omitted).

entitled to the payments based solely on its status as present owner under these circumstances.

N.P. next relies upon the *D'Oench, Duhme*[10] doctrine in arguing that the agreement between Turboff and First Texas is unenforceable. Although it appears the agreement between First Texas and Turboff may be vulnerable to attack under *D'Oench, Duhme*,[11] we do not see how that might impact our decision here. Rather, we rely upon N.P.'s notice of Turboff's claim, the reservation of the reimbursements in the real estate purchase agreement and warranty deed, and Papadopoulos's testimony that he had knowledge of the exclusion of the reimbursements from his purchase of the property that controls here. We find this argument to be irrelevant to the trial court's judgment.

Similarly, we do not believe that characterizing Turboff's right to reimbursement as a personal, contractual one rather than an interest in property changes our conclusion. N.P. simply did not obtain the right to the MUD reimbursables when it purchased the property; that right was expressly excluded, N.P. knew it before it agreed to buy the land, and certainly had the opportunity to fold that exclusion into its negotiations for the ultimate sales price. We find no error in the trial court's judgment awarding Turboff the reimburse-ment rights to the existing facilities. N.P.'s issue on appeal is overruled.

## Turboff's appeal

Turboff appeals raising a single issue; it complains that because the MUD will pay the reimbursable amount only after receiving title to the facilities, the trial court erred in failing to order N.P. to deed the facilities over to the MUD. We disagree.

■■■■■ Our determination of this issue rests on whether Turboff is a third-party beneficiary to the contract between N.P. and the MUD. Under general contract principles, a third party may recover on a contract only if its parties intended to secure some benefit to that third party, and only if the contracting parties entered into the contract directly for the third party's benefit.[12] To qualify as one for whose benefit the contract was made, the third party must show that he or she is either a donee or creditor beneficiary of the contract and not one who is benefitted only incidentally by its performance.[13] The intention of the contracting parties controls, and a court will not create a third-party beneficiary contract by implication.[14] Such intention must be clearly and fully spelled out or enforcement by the third party must be denied.[15] Consequently, a presumption exists that parties contracted for themselves unless it "clearly appears" that

10. *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).

11. That doctrine states that no agreement that tends to diminish the interest of a financial institution under federal receivership is valid unless: (1) it is in writing; (2) it was contemporaneously executed by the depository institution and the person claiming the adverse interest; (3) it was approved by the board of directors or loan committee; and (4) from the time of its execution it has been continuously a record of the financial institution. *See Coker v. Cramer Financial Group, Inc.*, 992 S.W.2d 586, 590–91 (Tex.App.—Texarkana 1999, no pet.); *Pierson v. SMS Financial II, L.L.C.*, 959 S.W.2d 343, 349 (Tex.App.—Texarkana 1998, no pet.). This record contains no showing that the agreement between Turboff and First Texas was approved by the institution's board or loan committee.

12. *MCI Telecommunications Corp. v. Texas Utilities Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999).

13. *Id.*

14. *Id.*

15. *Id.*

they intended a third party to benefit from the contract.[16]

The 1997 utility agreement between N.P. and the MUD provides that upon completion of construction of the facilities, and subject to certain conditions, N.P. shall be obligated to convey and the MUD shall be obligated to purchase the facilities. The MUD is obligated to pay the purchase price only if and when and to the extent that such amounts are available from the sale of bonds for such purpose. Further, the MUD is under no obligation to issue the bonds or pay the purchase price unless and until certain conditions are met, including full performance by the developer and approval of the purchase by the Texas Natural Resource Conservation Commission.

■ Although the 1997 agreement does recognize a controversy between Turboff and N.P. regarding payment for the existing facilities, it contains nothing requiring N.P. to convey the facilities for Turboff's benefit. Any benefit to Turboff stemming from N.P.'s sale of the facilities to the MUD is incidental to the main purpose of the agreement, which is to provide for the development, financing, and sale of utilities between N.P. and the MUD. Accordingly, we find that Turboff has not overcome the substantial burden of proving the 1997 contract was clearly intended to benefit him, and the trial court did not err in denying his request that N.P. be compelled to execute a deed to the MUD. Turboff's issue on appeal is overruled. N.P.'s motion for rehearing is overruled.

## CONCLUSION

The trial court's judgment is affirmed.