**N.P., INC., Petitioner,**

v.

**Jerald A. TURBOFF, Trustee, and Julius Glickman, Respondent.**

**No. 01–1167.**

Supreme Court of Texas.

Argued Nov. 20, 2002.

Decided May 22, 2003.

Rehearing Denied Aug. 21, 2003.

Kent Hance, Hance Scarborough Wright Woodward & Weisbart, LLP, Cyndy Olson Bourland, Merica & Bourland, P.C., Austin, Kent Rutter, Lynne Liberato, Alene Ross Levy, Murry B. Cohen, Haynes & Boone, L.L.P., Houston, Eric Taube, Hohmann, Taube & Summers, Mitchell Dodd Savrick, Savrick Schumann Johnson & McGarr, Austin, for petitioner.

Ben A. Baring, Jr., Paul J. McConnell, III, DeLange Hudspeth McConnell & Tibbets, Julius Glickman, Glickman & Hughes L.L.P., Houston, for respondent.

Justice ENOCH delivered the opinion of the Court.

In *Olmos v. Pecan Grove Municipal Utility District*,[1] the court of appeals held that the holder of title to utility facilities was entitled to the construction costs reimbursement for those facilities from the Municipal Utility District that agreed to buy the facilities when constructed. In that opinion, the court explained that title to the facilities had not been severed from the land otherwise conveyed, and thus, the right to reimbursement of the construction costs passed to the current property owner and did not remain with the original developer.[2] It is this discussion into which Jerald A. Turboff and his attorney, Julius Glickman, attempt to bring their complaint that though N.P., Inc. owns title to the utility facilities, Turboff and Glickman are entitled to the construction costs reimbursement because Turboff reserved the right to that reimbursement when he lost title to the facilities. The court of appeals agreed with the trial court that Turboff and Glickman prevail on their argument.[3] But we disagree. We reverse the court of appeals' judgment and render judgment for N.P., Inc.

On February 29, 1984, Turboff, a real estate developer, entered into a contract with the Harris County Municipal Utility District No. 36 (the "MUD") for the construction of water, sewer, and drainage facilities on a 135–acre tract of land Turboff was developing in north Houston. Under the terms of the contract, Turboff promised to build the utility facilities according to certain MUD-approved plans and specifications. In addition, Turboff agreed to convey the facilities to the MUD by "general warranty deed or other similar instrument" and to provide proof of title, "free and clear" of all liens. In exchange, the MUD promised to purchase the facilities upon receiving title to them if, among other things, the facilities were constructed according to the plans and completed in a "good and workmanlike manner." Under the contract, the purchase price acted as a right of reimbursement for Turboff's construction costs.

In 1983, Turboff borrowed $26 million from First Texas Savings Association to purchase and subsequently develop the tract. Of that $26 million, Turboff spent nearly $2 million installing the utility facilities. As security for the loan, First Texas received a lien on the property.

Before Turboff completed the construction and conveyed the facilities to the MUD as required under the contract, First Texas declared Turboff in default on his loan. Because Turboff claimed that First Texas wrongfully placed him in default, he sued First Texas. Attorney Julius Glickman represented Turboff in the litigation, and Turboff assigned to Glickman, as a part of his fees, an interest in any MUD reimbursement payments Turboff would receive under his 1984 contract with the MUD. (Because Glickman's claim is derivative of Turboff's interest in the MUD proceeds from his MUD contract, we will hereafter refer to Turboff and Glickman as "Turboff.") In June 1986, while the litigation was pending, First Texas foreclosed on the property.

On December 27, 1988, just thirty minutes before the Federal Savings and Loan

**1.** 857 S.W.2d 734, 740 (Tex.App.-Houston [14th Dist.] 1993, no writ).

**2.** *Id.* at 738–40.

**3.** 54 S.W.3d 886, 888 (op. on rehearing).

Insurance Corporation ("FSLIC") placed First Texas in receivership, First Texas and Turboff settled all claims between them. According to the settlement agreement, First Texas retained title to the north Houston property, including the utility facilities, but gave up any claim it had in the construction costs reimbursement under Turboff's 1984 contract with the MUD. In addition, First Texas paid Turboff $400,000 for developing the property and released Turboff from any future claims by First Texas.

First Texas released its interest in the MUD reimbursement payments to Turboff not only in the settlement agreement but also in a separate document, the Stipulation of Interest. The Stipulation warranted that Turboff was the "sole owner[ ]" of the MUD receivable payments, and any proceeds due under the 1984 MUD contract would be payable to Turboff. First Texas also sent notice to the MUD, advising it of the settlement and its terms. After being declared insolvent by the FSLIC, First Texas's assets were transferred to First Nationwide Bank.

On February 10, 1995, N.P., Inc., through its owner and trustee, Dr. C.N. Papadopoulos, purchased the property from First Nationwide, including the existing utility facilities. First Nationwide transferred title to the property, but in both the Real Estate Purchase Agreement and the Warranty Deed, First Nationwide expressly excluded from the conveyance any right to the MUD reimbursement payments. Upon taking possession of the property, N.P., Inc. repaired the existing utilities and constructed and installed additional facilities.

On February 25, 1997, N.P., Inc. entered into its own contract with the MUD. In that contract, the MUD mentioned its pri-

or 1984 contract with Turboff, but it stated that the "Developer [N.P., Inc.] is the current owner of . . . all of the land within the Service Area." Similar to the 1984 contract with Turboff, the MUD agreed to purchase the utility facilities upon certain conditions being met, and N.P., Inc. agreed to transfer ownership and possession of the facilities to the MUD. But the 1997 contract stated:

> [A] controversy exists as to the rightful recipient of the Purchase Price for the Existing Facilities, and, notwithstanding the foregoing or any other part or provision hereof to the contrary, the [MUD] shall not be obligated hereunder to pay to [N.P., Inc.] all or any portion of the Purchase Price for the Existing Facilities unless and until such dispute covering the rightful payee of the Purchase Price is settled by mutual agreement, finally adjudicated or otherwise resolved to the reasonable satisfaction of the [MUD] such that payment of the Purchase Price for the Facilities can be made by the [MUD] without undue risk of wrongful or duplicate payments.

In 1998, Turboff sued N.P., Inc., seeking a declaratory judgment that Turboff, not N.P., Inc., was entitled to the MUD payments according to the terms of the 1984 contract. Turboff also asked the trial court to order N.P., Inc. to convey title to the facilities to the MUD. Both parties moved for summary judgment. After reviewing the summary judgment evidence, the trial court found as a matter of law that although N.P., Inc. owned the existing facilities, Turboff owned all sums due from the MUD. But the trial court also held that Turboff had no right to compel N.P., Inc. to convey the facilities to the MUD. Thus, all parties appealed.

On appeal, N.P., Inc., citing to *Olmos,*[4] argued that as the owner of the facilities, it

4. *Olmos,* 857 S.W.2d at 738–40.

was entitled to the MUD payments. But the court of appeals concluded that Turboff was entitled to the reimbursement not only because N.P., Inc. had notice of Turboff's claim to the MUD proceeds, reflected in both the Real Estate Purchase Agreement between N.P., Inc. and First Nationwide and in N.P., Inc.'s Warranty Deed, but also because Turboff specifically reserved the right to the reimbursement through his transactions with First Texas.[5] Regarding Turboff's complaint that N.P., Inc. should be compelled to transfer the facilities' title to the MUD, the court of appeals agreed with the trial court that N.P., Inc. was under no obligation to do so.[6] As a result, the court of appeals affirmed the trial court's judgment.[7]

Both parties petitioned this Court. And we granted both petitions.

■ N.P., Inc. argues that because Turboff defaulted on his loan with First Texas, which then foreclosed on the real estate, Turboff lost title to the facilities and therefore the power to convey title as required by the 1984 MUD contract. And because of his inability to perform, he lost the right to the MUD reimbursement. In support, N.P., Inc. cites *Olmos.*[8]

In response, Turboff argues that the MUD proceeds were severed from the utility facilities when Turboff and First Texas settled their dispute. Turboff also points to both the Real Estate Purchase Agreement and the Warranty Deed from First Nationwide to N.P., Inc., which excluded the right to reimbursement with the conveyance of the property. Turboff argues that those documents made the conveyance to N.P., Inc. "subject to" that reserved right, which according to Turboff, distinguishes the result in *Olmos* because the parties there never severed their claim to the MUD payments.[9]

*Olmos* holds that the original developer was not entitled to a MUD reimbursement because the MUD was released from the contract when the developer lost the property through foreclosure.[10] In *Olmos*, the original developer, Edward D. Guttman, contracted with the Pecan Grove MUD to construct utility facilities for a subdivision he was developing.[11] Guttman assigned his right to payment under his MUD contract to Jose Zavala Olmos.[12] But before Guttman conveyed the property to the Pecan Grove MUD, he defaulted on his loan, and his lender, American General Investment Corporation, foreclosed on his property.[13] Pecan Grove Associates bought the property from American General, and when Pecan Grove Associates conveyed the utility facilities to the Pecan Grove MUD, Olmos asserted his claim to the MUD proceeds.[14]

The Fourteenth Court of Appeals concluded that Pecan Grove Associates owned the MUD payments, reasoning that the right Olmos asserted is "a contract right to the [MUD proceeds] by virtue of his assignment under the Guttman/MUD Sales Agreement."[15] And Olmos's assigned right "depended on Guttman's perfor-

---

5. 54 S.W.3d at 890–91.

6. *Id.* at 893.

7. *Id.* at 888.

8. *Olmos,* 857 S.W.2d at 738–40.

9. *Id.* at 738.

10. *Id.* at 740.

11. *Id.* at 736–37.

12. *Id.* at 737.

13. *Id.*

14. *Id.*

15. *Id.* at 738.

mance under the [MUD] Sales Agreement."[16]  Because Guttman lost title through foreclosure proceedings, he could not deliver title to the Pecan Grove MUD, resulting in a breach of his MUD contract.[17]  Therefore, the Pecan Grove MUD was not obligated to pay Olmos.[18]

■ Turboff misunderstands this discussion in *Olmos.*  There, the court, regarding a related point, analyzed whether title to the utility facilities passed with the underlying real estate.  It is in this context that the court stated:

> Generally, absent a specific reservation in a deed, buildings and other improvements used in connection with realty in such a way as to constitute appurtenances or fixtures, pass as a matter of course by the conveyance. . . . However, in the case at bar, title to the Facilities was never severed from the Property and conveyed to the MUD.[19]

From the context, it is clear that *Olmos* was not talking about severing entitlement to payment for construction of utility facilities, but rather was addressing whether the utility improvements were severed from the underlying real estate.[20]  To get where Turboff wants us to go, we would have to conclude that the construction costs reimbursement was some sort of interest running with the land, which interest could otherwise be reserved.  It is not, and therefore, it cannot.

The interest Turboff attempts to enforce against N.P., Inc. is simply an interest in a contract that Turboff cannot now honor. Turboff acknowledges that the right to receive the MUD proceeds arose from his 1984 contract with the MUD.  Article I, section 1, paragraph 4 of that contract provides:

> For and in consideration of [Turboff]'s agreement to finance and/or construct such facilities, as hereinafter provided, and the [MUD's] agreement to pay to [Turboff], as hereinafter provided, the Purchase Price therefor (as hereinafter defined), [Turboff] agrees to sell and assign and the [MUD] agrees to purchase all of [Turboff]'s right, title and interest in and to the final plans, specifications and contract documents for such improvements and the facilities to be constructed pursuant thereto.

Article III, section 6 further states:

> [Turboff] shall convey the facilities to the [MUD] by general warranty deed or other similar instrument will [sic] full warranties, free and clear of all liens, claims, encumbrances, options, charges, assessments, restrictions, limitations and reservations, including liens for mechanics, materialmen, suppliers, laborers, artisans or ad valorem taxes for the current year.  [Turboff] shall provide such proof of title and proof that no such liens, claims, and encumbrances exist as may be reasonably required by the [MUD].

Thus, the 1984 contract between Turboff and the MUD required Turboff, as developer, to have and to transfer clear title to the facilities to the MUD in exchange for the MUD's agreement to buy the facilities.[21]  But when Turboff defaulted on his loan and First Texas foreclosed on the

---

16.  *Id.* at 740.

17.  *Id.*

18.  *Id.*

19.  *Id.* at 738.

20.  *Id.*

21.  *See Windstone Props., Inc. v. JLM Fin. I, Ltd.*, No. 01–96–01101–CV, 1997 WL 724878, at *4–5 (Tex.App.-Houston [1st Dist.] Nov. 20, 1997, pet. denied) (not designated for publication).

property, including the utility facilities, it became impossible for Turboff to perform according to the terms of his 1984 MUD contract.

Turboff's right to the MUD proceeds is a right that the parties created by contract, in which the MUD agreed to buy the utility facilities from Turboff if he conveyed title.[22] This contract right to the MUD proceeds is purely personal as between Turboff and the MUD.[23] While an interest in utility facilities may run with the land as appurtenances or improvements,[24] this personal contract right does not.[25]

Turboff cites to *Phoenix Holdings, Ltd. v. Circle C Land Corp.*[26] as additional support that Turboff may "reserve" his interest in the construction proceeds from the transfer of the actual facilities. But Turboff's reliance on *Phoenix Holdings* is also misplaced. In *Phoenix Holdings*, the original developer, Circle C Land Corporation ("Circle C"), conveyed completed utility facilities to four different local MUDs according to the terms of four different MUD contracts.[27] Thus, Circle C's entitlement to payment from the MUDs under the respective contracts matured. Circle C then sold its development to Phoenix Holdings, and as a part of that sale, Circle C assigned to Phoenix Holdings its right to some of the MUD reimbursement payments.[28] The Austin court of appeals was called upon only to determine which MUD payments Phoenix Holdings had been assigned.[29]

Circle C obtained its right to the MUD reimbursement payments because it conveyed the facilities' title to the various MUDs according to the terms of the contracts.[30] Because its entitlement to be paid had matured,[31] Circle C had the right to assign its interests in the MUD payments in any manner it desired. *Phoenix Holdings* is not a case where a right to reimbursement was "reserved" or "severed" from title to the property.

In this case, N.P., Inc. holds a property right—title to the utility facilities—obtained through the purchase from First Nationwide. And by virtue of its own contract with the MUD, it has a contract right—to receive payment from the MUD in exchange for transfer of title to the facilities to the MUD. Consequently, N.P., Inc.'s motion for summary judgment, arguing it was entitled to the MUD reimbursement payments, was correct, and N.P., Inc. is entitled to judgment.

22. *See Olmos,* 857 S.W.2d at 738.

23. *See Jones v. Cooper Indus., Inc.,* 938 S.W.2d 118, 124 (Tex.App.-Houston [14th Dist.] 1996, writ denied) (citing *Montgomery v. Creager,* 22 S.W.2d 463, 466–67 (Tex.Civ. App.-Eastland 1929, no writ)); *see also Westland Oil Dev. Corp. v. Gulf Oil Corp.,* 637 S.W.2d 903, 910–11 (Tex.1982).

24. *See, e.g., Windstone Props.,* 1997 WL 724878, at *5–6; *Pine v. Gibraltar Sav. Ass'n,* 519 S.W.2d 238, 241 (Tex.Civ.App.-Houston [1st Dist.] 1974, writ ref'd n.r.e.); Tex. Bus. & Com.Code § 9.102(a)(41).

25. *See, e.g., Clear Lake City Water Auth. v. Clear Lake Utils. Co.,* 549 S.W.2d 385, 388

(Tex.1977); *Jones,* 938 S.W.2d at 124; *Frey v. DeCordova Bend Estates Owners Ass'n,* 632 S.W.2d 877, 879–80 (Tex.App.-Fort Worth 1982), *aff'd,* 647 S.W.2d 246 (Tex.1983); *Montgomery,* 22 S.W.2d at 466.

26. 987 S.W.2d 933 (Tex.App.-Austin 1999, pet. denied).

27. *Id.* at 934.

28. *Id.* at 934–36.

29. *Id.* at 934–35.

30. *Id.* at 934.

31. *Id.*

Because we conclude that Turboff had no entitlement to the MUD proceeds payable on the utility facilities, Turboff, of course, had no claim entitling him to force N.P., Inc. to transfer title to the facilities to the MUD. The court of appeals properly affirmed the trial court's denial of Turboff's motion for summary judgment on this point.

Turboff's right, if any, to reimbursement from the MUD for construction of the utility facilities was a personal contract right subject to Turboff's ability to convey title, and Turboff was unable to perform. Consequently, we reverse in part the court of appeals' judgment awarding the reimbursement payments to Turboff. And we render judgment for N.P., Inc. As well, we affirm that part of the court of appeals' judgment holding that Turboff cannot compel N.P., Inc. to transfer the facilities.